## RAYMOND W. EPPERSON *v.* STATE OF MARYLAND

[No. 396, September Term, 1968.]

*Decided August 11, 1969.*

The cause was argued before MURPHY, C.J., and AN-DERSON, MORTON, ORTH, and THOMPSON, JJ.

*James C. Cawood, Jr.,* for appellant.

*John J. Garrity, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *James E. Fannon, Jr., Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

Raymond W. Epperson, the appellant, was convicted of manslaughter by a jury in the Circuit Court for St. Mary's County to which the case had been removed from Prince George's County. The presiding judge, Philip H. Dorsey, Jr., imposed a sentence of ten years. There was evidence that:

At approximately 8:30 P.M. on February 24, 1968, Mr.

and Mrs. Donald M. Smith of Colmar Manor in Prince George's County, asked their house guest, Raymond W. Epperson, the appellant, if he would like to accompany them to a party being given by a mutual acquaintance, Marsha Skeens. The appellant declined and the Smiths proceeded to the Skeens' party which was also attended by Andy Glinos and the victim, John Carakoulakis, who was a steelworker from Baltimore.

During the course of the evening, the appellant called the Skeens' residence approximately four or five times. The conversations over the phone between the appellant and the victim centered around an old loan the victim had made to the appellant and whether the appellant wished to ride along to Baltimore when the victim was taken home. According to the appellant, the first discussion with the victim was characterized as not being of an aggressive nature, but shortly before the Smiths arrived home, the victim had called again and this time "started right in on me. You know, . . . he was pretty well drunked up. I could tell by the slur in his voice. And John was the type of person that if you gave him an inch, he took a mile. . . . (H)e called me all kinds of names, and he said he was coming over and get me . . . and this sort of stuff. But I thought it was conversation more than actual threat. But I decided the best thing to do would be to leave . . . if he knew that I was there." When the Smiths arrived home, the appellant asked Mrs. Smith about the victim, and according to the appellant, "(S)he made a remark that he was no friend of mine. And she also told me that he had a gun."

Immediately after the Smiths arrived home, John Carniello (known as "Rocky") stopped at the Smith's residence to pick up his younger brother who was visiting fifteen year old Clyde Smith. Upon knocking and being let in by Mrs. Smith, "Rocky" was met at the door by the appellant who had a .32 automatic in his hand. According to the witness, "Well, I saw Ray, Mr. Epperson, and he realized who I was and put the gun away, and I

asked Smith if he had anything to drink. . . . I went in the kitchen with Mr. Epperson and he opened me a beer and gave it to me and we started talking."

While the two men were in the kitchen talking, a knock on the door interrupted an argument that the Smiths were having in the living room. According to Smith, "There was a knock on the door and I opened the door and it was this John Carakoulakis."

Mr. Smith testified that the following took place:

> "Well, I was surprised to see him because I just left him. I didn't know, you know—so he said, 'Hi, Smitty,' I said, 'Hi, John, what are you doing here?' He didn't answer me. He said, 'Where's Ray?', I said, 'I don't know, I think he's out in the kitchen.' I said, 'Come on in.' So he walked — just before he got to the dining room door, a small living room, I imagine about 2 feet from the dining room, he says, 'Hi, Ray, you mother you.' But it wasn't in a nasty tone. It's just, you know—and I had sat back down, and next thing I noticed sound like fire crackers going off, and I looked over at John and he was bringing his hands up towards his stomach, and first I thought it was a joke, you know. I didn't know because—and then I jumped up and I said, 'Ray, — hollered at Ray 'You crazy S.B., you shot that man.' "

> \* \* \*

> "And then my wife grabbed me from behind and held me, and about that time my son, he come out of the bedroom and she hollered for him and they got me down. Then by that time, Mr. Carakoulakis or John Carakoulakis was laying on the floor and I was running to the kitchen door and they grabbed me again."

Smith further testified that he observed the hands of the victim when he invited him inside, and stated that he

468

had nothing in his hands, that it took the victim about thirty seconds to get from the front of the living room to the doorway of the dining room, and that the victim "had nothing in his hands" when standing at the doorway.

Mrs. Smith elaborated on the seemingly good nature of the victim as he entered the Smith's residence by testifying that before the victim entered the archway of the dining room to greet the appellant, who was in the kitchen, he came over to her and scratched the top of her hair. "The only thing he said is 'Where is that Epperson at?' . . . He said it in a nice way. He was smiling. He was all teeth you know. He was smiling. He said, 'Where's that Epperson at?' And I said, 'I think he's in the kitchen' . . . ." Mrs. Smith then testified that the appellant shot the victim without saying a word.

John Carniello, who had been standing in the kitchen with the appellant drinking beer, testified that he heard a "knocking or banging at the door" as the appellant, who was wearing a tweed overcoat, was telling him about somebody having a contract on him. As they came out of the kitchen, the victim said, " 'Hi, Ray, you mother fucker.' So by that time I looked around and Ray was pulling something out of his pocket. And I looked back around and I heard the shooting. And I just dove from between them . . ." The witness went on to say that he heard what "Seemed like a couple of shots and a small pause, . . . just a split second pause and that's when I dove. And then some more because I could hear them while I was going through the air." John Carniello further testified that after regaining his feet and subduing Smith who was coming towards the door, he went into the bedroom and grabbed his brother and left the house. Carniello stated that as he was leaving, he stepped over the victim who was lying beside a gun that he had not previously seen.

Fifteen year old Ricky Carniello, who was awakened by the shots and taken out of the bedroom by his brother,

elaborated on the pistol that his brother had seen on the floor. Ricky stated that as they were coming out of the bedroom, he observed what looked to be like a revolver laying underneath the body of the victim with its handle exposed. "All you could see was the hand poking out and his shirt was lifted up. You could see his T-shirt and his top shirt."

Fifteen year old Clyde Smith was also awakened by the shots, and when he ran into the living room, he looked down at the body before looking up to see the appellant holding a gun and standing at the doorway between the kitchen and the dining room. When his father yelled that the appellant was crazy and attempted to go after him, the appellant said, according to the boy, " 'Hold him back or I'll shoot him, too.' 'Shoot' or 'Kill', I'm not sure between the two words." The boy then jumped over the body and grabbed his father. The witness further testified that the victim was moaning while fighting for his life after being shot, and according to his father, was saying "Why Ray, why." He further stated that after the appellant and the Carniello boys went home, Marsha Skeens and Andy Glinos came into the house, but left before the police arrived.

In addition to the appellant's testimony previously related as to the telephone conversation and his resultant anxiety, the appellant testified in relation to the actual shooting that:

> "I came back through the kitchen into the dining room. And I got about to the dining room door when Big John came through the door. Now, how Rocky got out of the way, I don't know. He managed some way, because John was running [sic] and he was running directly toward me with the drawn gun. And I took the gun out of my pocket that I had in my pocket and I fired."

The appellant further related that he fired the gun when the victim was almost within reaching distance,

and that the impact of the victim's "rush" knocked him down. "So I got up off the floor and he was twisting around in the dining room and he fell face down in the doorway into the room." The appellant also stated that he went out the back door and around to the driveway where he observed Andy Glinos and Marsha Skeens standing beside a car. He then crossed over to the next street and proceeded towards Bladensburg Road.

A French automatic-loading pistol, which was said to have been loaded at the time of the shooting with nine cartridges, and which was the weapon the appellant admitted using, was found by a child some months later under a bush two blocks away from the scene. It contained two live bullets. Six .32 caliber bullets were recovered from the body of the victim at the time of the autopsy, and according to Dr. Cornelius Burns, three bullets entered the front part of the body's torso, and four bullets entered the back of the chest area. The remaining bullet passed completely through the body and was not recovered.

I

Appellant testified that he knew the deceased was a muscle man and enforcer for Marsha Skeens, or her husband, who were bookmakers. His counsel offered at the trial a proffer of a recent threat that Marsha had made to have the deceased kill the appellant. The appellant alleges that the trial court committed reversible error in declining the proffer, contending that Marsha Skeens was outside of the house at the time of the shooting and perhaps had removed the gun carried by the deceased prior to the arrival of the police; or in other words that the deceased and Marsha Skeens were acting in concert at the time of the killing. He cites *Magan v. Commonwealth*, 119 S. W. 735 (Ky.), *People v. Moretti*, 6 Ill. 2d 494, 129 N.E.2d 709, and *Rucker v. State*, 158 So. 2d 39 (Miss.) wherein it was held that where a third person was directly (or remotely in *Rucker v. State, supra*) involved in the crime, that person's threats would be admissible

under the principle followed by this Court in *Barger v. State*, 2 Md. App. 565, 235 A. 2d 751 wherein we held that recent threats made by the deceased against the defendant, whether communicated to the defendant or not, are admissible in evidence provided there is some evidence of self-defense and a question as to who was the aggressor. There was no contention in the present case that the threats were communicated to the accused. In the cases cited by the appellant, there was no question the third party was directly involved in the crime; but, in the case at bar, evidence of Marsha Skeens' connection with the crime was most fragmentary and unconvincing, and we cannot say that the trial judge abused his discretion in declining to receive the evidence on the basis of remoteness. We point out, however, the appellant was convicted only of manslaughter which was justified by the excessive use of force, even if the deceased were the original aggressor, *Long v. State*, 7 Md. App. 256, and thus the error, if any, was harmless.

## II

Appellant alleges error when the court refused permission for him to recall for cross-examination a state's witness who gave "perjured testimony known to the State to be perjured, when such was made known to the defendant after the witness furnished his testimony but before the close of the State's case." While testifying, fifteen year old Clyde Smith stated that he saw the appellant standing by the kitchen doorway with a gun. He admitted that during the investigation he had made a statement to Detective Sergeant Clements and to defense counsel that he was not positive of the identity of the appellant. When he was asked why he stated differently during the investigation, he replied:

> ". . . I was thinking that a person's life could be on my shoulders whether a man lived or died or went to jail for the rest of his life or not. And I guess it worked on me and I was feeling sorry

for him. But I thought to myself I shouldn't feel sorry and I'm not going to perjure myself for anybody. . . ."

Under further cross-examination, Smith was asked the following question:

"You mentioned that I talked to you and Sgt. Clements. Did anyone else talk to you about your testimony in the case besides the police officer and I assume Mr. Fannon [Assistant State's Attorney] ?"

The witness replied that he had talked to many people about the incident, but he had only told his parents the version he had related to defense counsel and Sergeant Clements.

After another witness had testified, Mr. Fannon advised defense counsel that young Smith had also indicated to him that he was not sure that it was the appellant who was standing in the kitchen doorway holding the gun. Appellant alleges that this constituted perjury known to the State and that he should have been permitted to recall the witness for further cross-examination. The court denied the request on the grounds that the witness had readily admitted telling defense counsel, the State's investigator and his parents that he was unsure of the identity and felt that the jury was sufficiently acquainted with the evidence to determine the credibility. We agree with the trial court's ruling, particularly since identity was not a real issue in the case.

### III

Appellant contends the trial judge should have granted the motion for acquittal. The record shows, however, that although a motion for acquittal was made at the conclusion of the State's case, it was not renewed at the end of the complete case, and, therefore, under Maryland Rule 755b the motion was withdrawn. There is, therefore, nothing before this Court to review, Maryland Rule 1085.

It is, of course, obvious from what we have stated earlier in the opinion the contention is devoid of merit.

## IV

Without further clarification, appellant alleges that the court erred in failing to instruct the jury more thoroughly on the law of self-defense. There was no objection to the instructions below. While under Maryland Rule 756g, we are permitted to notice clear error in the instructions, we see no such clear error in the instructions given by the trial court.

## V

Appellant contends the jury verdict was improper because it found him guilty of manslaughter without a specific finding that he was not guilty of murder. To support his contention, he cites *State v. Flannigan,* 6 Md. 167 and *Weighorst v. State,* 7 Md. 442. While it is true, according to the transcript, the jury's verdict was entered in the manner alleged by the appellant, the trial judge immediately stated to the jury it was his understanding the verdict was "not guilty of murder but guilty of manslaughter" and the jurors all agreed on the revised verdict. Both attorneys stated they were satisfied with the verdict. Where it is obvious the defendant is not prejudiced, the trial judge can amend the substance of a verdict in open court, provided the jury agree to the verdict as amended. *Heinze v. State,* 184 Md. 613, 42 A. 2d 128. In deciding criminal cases, mere technicalities are of less importance than formerly.

## VI

Finally, the appellant contends the indictment was for murder and, therefore, he could not be convicted for manslaughter thereunder. This contention is contrary to the law. See *McFadden v. State,* 1 Md. App. 511, 231 A. 2d 910.

*Judgment affirmed.*