## WENDALL THEROGOOD DERRICKS AND HENRY WILLIAM HILGEMAN *v.* STATE OF MARYLAND

[No. 272, September Term, 1969.]

*Decided March 31, 1970.*

262

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*William J. Dwyer* for appellants.

*James F. Truitt, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, David K. Poole, Jr., State's Attorney for Washington County,* and *Lynn F. Meyers, Assistant State's Attorney for Washington County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

Wendall Therogood Derricks and Henry William Hilgeman, the appellants, were convicted of storehouse breaking and petty larceny in a jury trial in the Circuit Court for Washington County. Each was sentenced to a term of three years on the first charge and one year concurrently on the second charge.[1] On appeal they contend

---

1. A codefendant Richard Ardinger Spigler was likewise convicted and sentenced. After his sentence was reduced to two years, he dismissed his appeal.

that the trial judge should have granted their motions for acquittal. We agree.

The Friendly Market is located at 124 West Franklin Street in Hagerstown. At the front of the market are two coin machines, one dispensing ice and another dispensing soft drinks. The proprietor, Percy Divelbiss, testified the ice machine was locked at night but the soft drink machine was available for use twenty-four hours a day. Immediately behind the store is a large lot two or three hundred feet in depth extending to a public alley known as Weller's Alley. Between the market and a church is a walkway which extends through to Weller's Alley. It is kept lit at night by the proprietor of the store for the benefit of his customers and tenants who live to the rear of the store. At approximately 10:45 or 11:00 P.M. on Monday, February 24, 1969, the proprietor paid an unexpected visit to the store and heard a person or persons exiting the rear door as he entered the front door. Subsequent investigation showed the store had probably been entered through a broken window; some old, but not ancient, coins in the face amount of three or four dollars had been taken and possibly some cigarettes and beer. The police were called and were around the store for the next hour or hour and a half. The proprietor and his son, who joined him later, stayed around the store to cooperate with the investigation and to repair the broken window. About 12:15 A.M. the proprietor and his son, after locking the front of the store, started down the walkway beside the store when they saw the appellant Derricks, whom they recognized from previous contacts. Derricks immediately started to run, followed by the proprietor and his son. Appellant entered an old model car parked in Weller's Alley and drove off at an ordinary and not at a high rate of speed. A description of the car was telephoned to the police. A few moments later the two appellants and Spigler were apprehended at a filling station located about three blocks away by Officer Richard Haden who testified as follows:

"Q. And will you tell the Court and Jury, please,

in and about when you got the information and what as a result of that that you did?

"A. Shortly after Officer Moser received the initial call from Mr. Divelbiss, and also by way of radio, I had learned that a vehicle that was believed to have been in this breaking and entering was a 1958 or '57 Blue Oldsmobile Convertible, very dirty in appearance. And also, that this vehicle was believed to have been last seen going north on Jonathan Street. I then proceeded north on Jonathan Street in the cruiser at a high rate of speed in an effort to apprehend or detain this vehicle. When I came to the Atlantic Station in the four hundred block of North Jonathan, in a telephone booth which was very well lit, and using the telephone, I observed Richard Spigler, the subject sitting on the bench there.

"Q. One of the defendants?

"A. Yes sir.

"Q. Alright.

"A. I could not have stopped immediately, and observing this subject in a phone booth, it aroused my suspicion.

"Q. Did you continue going at that time?

"A. Yes sir, I circled the block down Charles and back up Jonathan. At this time no one was in the phone booth. I observed sitting on the inside of the gas pump, a 1958 Blue Oldsmobile Convertible—two door, West Virginia Registration. At this time, I observed this vehicle to be very dirty and the license tag to be very dirty. At this time sitting beneath the wheel was Richard Spigler; sitting in the middle was Derricks and Hilgeman sitting on the right. I approached this vehicle and advised these subjects to get from same, at which time I had also notified Headquarters what I observed and got assistance on the scene. These subjects were searched

there and nothing was found on them. I observed Derricks' and Spigler's clothing to be very dirty. Hilgeman was dressed at this time in dark clothing with a three-quarter length split leather black jacket on. I guess that is what it is. That is what it appeared to me to be. And also, Hilgeman not being as dirty as the other two subjects. I then advised these three defendants of taking them to Headquarters for identification. I brought them to Headquarters and wherein, in the light, I observed on the bridge of Spigler's nose, a very jagged cut."

\* \* \*

"Q. How much money did you find on any or all of the three persons?

"A. I found no property whatsoever—no identification or nothing.

"Q. When you stopped the car, or when you apprehended these three at the Atlantic Station on Jonathan Street, was there any soda in evidence—in other words, bottles of soda or cases of soda?

"A. No sir, nothing was recovered, from the vehicles [sic] nor from the Defendants."

On cross-examination he stated as follows:

"Q. When you arrived there, one was in the phone booth and the other one was in the car?

"A. Yes sir.

"Q. You were under the impression at the time that you better head out in that direction fast and get that car?

"A. Until I observed Spigler in the phone booth.

"Q. Why would the man in the phone booth attract your attention?

"A. Because of this subject's movements and from my police work, I have observed him with companions. . . .

"*BY THE COURT:* No, just a minute.

*"BY ATTORNEY MEYERS:* They asked, your Honor.

*"BY THE COURT:* Yes. . . .

"Q. In other words, he, himself at the time was not doing anything at the time, except making a phone call, is that right?

"A. Whenever I see Mr. Spigler I always get. . . .

"Q. You don't trust Mr. Spigler?

"A. I didn't say that."

\* \* \*

"Q. Did you arrest all three of them?

"A. Yes sir.

"Q. And you found nothing whatsoever to connect them with this particular breaking and entering? No old coins?

"A. No sir, no old coins.

"Q. No pop or cigarettes or anything. . . .

"A. They had cigarettes on them.

"Q. Did they have a quantity on them?

"A. No, one or two packs.

"Q. You say that they had no identification whatsoever? Didn't they have wallets with cards or something in it?

"A. Yes, they had wallets.

"Q. What was in their wallets?

"A. I don't know, I didn't go through their wallets."

\* \* \*

*"BY ATTORNEY WILLIAM DUNHAM:*

"Q. Isn't it true that all of them had a wallet, including Spigler, with his cards in it?

"A. Yes, Spigler had driver's license, etc.

"Q. What made you state, Officer, that you found no identification on these subjects?

"A. Because a driver's license and a draft card is no true identification.

"Q. A driver's license and a draft card is not true identification?

"A. No sir."

James Yates testified that he was walking a little girl home about 9:00 P.M. on February 24, 1969, when he saw appellant Hilgeman and codefendant Spigler "just talking" in Weller's Alley to the rear of the Friendly Market; that he saw no automobile; and that when he returned to the same spot about 10:00, he saw Hilgeman in about the same spot alone smoking a cigarette. On cross-examination he admitted he testified at the preliminary hearing that he saw the two defendants at 10:00 and again at 11:00 but explained that he had his times mixed up, that he now remembered the correct time because the girl's mother had told him to have her home at 10:00. He testified he had worked for the Friendly Market occasionally and helped them clean up the place.

Codefendant Spigler testified he was driving through the alley with appellant Hilgeman when his car became flooded. Spigler walked to a nearby bar to call a friend for assistance while Hilgeman stayed near the car until Spigler returned. The bartender verified that he was in the bar and bought a cup of coffee at or about the time mentioned. Since Spigler was unable to locate his friend, he returned to the car which started immediately. As they were continuing down the alley, they saw the appellant Derricks walking through the walkway to the rear of the Friendly Market. They called to him and he joined them in the car, saying he was getting some soft drinks. Appellant Hilgeman's testimony was substantially the same as codefendant Spigler's.

Derricks testified that he was playing cards with his girlfriend at a home to the rear of the Friendly Market; that he left to go get sodas from the machine in front of the Friendly Market when his friends called to him and he turned and ran to their car. His girlfriend testified he had been playing cards and did go to get sodas at or about the time he was observed in the alley beside the Friendly Market.

The record shows that Hilgeman had one burglary conviction and that Derricks had been convicted of larceny of an automobile as a juvenile. Neither the testimony at

trial nor at the application for review of sentence shows any criminal record for Spigler.

The law is clear we cannot reverse a judgment of a trial court for the failure to grant a motion to acquit merely because our review of the record causes us to form a conclusion different from the jury's. The test is usually stated that in order to reverse on this ground there must be no evidence, or rational inference therefrom, from which the jury could be convinced beyond a reasonable doubt of the defendant's guilt. We reviewed the question extensively in *Williams v. State,* 5 Md. App. 450, 247 A. 2d 731 as well as in several other cases. Applying the rule to these facts and considering the evidence most strongly in favor of the State, we must conclude that it is insufficient to prove appellants' guilt beyond a reasonable doubt. It is elementary that mere presence of a person at the scene of the crime is not of itself sufficient to prove the guilt of that person even though it is an important element in determination of the guilt of the accused, *Ball v. State,* 7 Md. App. 219, 254 A. 2d 367. We think the rule is stated most clearly in *Tasco v. State,* 223 Md. 503, 509, 165 A. 2d 456:

> "Of course, it is elementary that the mere presence of a person at the scene of a crime is not, *of itself,* sufficient to establish that that person was either a principal or an accessory to the crime. *Watson v. State,* 208 Md. 210, 117 A. 2d 549; *Judy v. State,* 218 Md. 168, 146 A. 2d 29. But presence at the immediate and exact spot where a crime is in the process of being committed is a very important factor to be considered in determining guilt; and in this case the trial court was not required to believe that the appellants were mere observers of a crime that was being committed, nor that it is a case where a crime had been committed one hour, one day or one week before, and the defendants happened, by chance, to come to the place where

the crime had been committed. Here we have a situation which permitted the trial court to draw a rational inference that the offenders were interrupted during the actual asportation of the potential fruits of the crime."

The Court further said:

"Flight, *alone,* is of course, not controlling; but it, also, is a factor that may be considered in determining guilt. *Clay v. State,* 211 Md. 577, 584, 128 A. 2d 634."

See also *Anderson v. State,* 3 Md. App. 362, 239 A. 2d 579 and *Williams v. State,* 3 Md. App. 58, 237 A. 2d 822.

From these principles we must analyze the facts very carefully. Accepting the testimony of Yates in most damaging form, it is shown that Spigler and Hilgeman were in the alley from two to three hundred feet from the rear of the store at or about the time the crime was committed. There was no testimony proving suspicious actions nor attempts to flee. Indeed, the testimony shows they made *no* attempt to flee an hour and a half later when the appellant Derricks joined them in the automobile. The testimony was that the automobile left in a normal manner and stopped about three blocks from the scene. A search of their persons and vehicle revealed nothing to connect them with the crime. Recalling there is no obligation on the trier of facts to accept appellants' testimony, *Rasnick v. State,* 7 Md. App. 564, 256 A. 2d 543, there was, nevertheless, no testimony to connect them with the crime except their mere presence and that alone is insufficient under the authorities heretofore cited, and under the circumstances herein described.

Nothing in the record establishes the presence of Derricks at the scene when the crime was committed. His presence an hour and a half later is not the same as being present at the time the crime was committed. His flight from the proprietor, under the circumstances, although a very suspicious circumstance, was not alone

270

sufficient to support a rational inference that he was one of the criminals. *Tasco v. State, supra.*

> *Judgments reversed.*
> *Case remanded for a new trial provided State forthwith satisfies trial court additional evidence is available.*