## RICHARD BARTON WOODARD AND CHARLES MIDFORD DEMBY v. STATE OF MARYLAND

[No. 46, September Term, 1971.]

*Decided October 1, 1971.*

The cause was submitted on briefs to ORTH, POWERS and GILBERT, JJ.

Submitted by *Frank Cannizzaro, Jr.,* for appellant Richard Barton Woodard. Submitted by *Leonard A. Briscoe* for appellant Charles Midford Demby.

Submitted by *Francis B. Burch, Attorney General, Gary Melick, Assistant Attorney General, Howard L. Cardin, State's Attorney for Baltimore City,* and *Charles O. Fisher, Jr., Assistant State's Attorney for Baltimore City,* for appellee.

GILBERT, J., delivered the opinion of the Court.

### THE FACTS

On January 16, 1970, Ronald E. Bunting, the proprietor of the Woodshed Lounge, located on Moravia Park Drive, was checking a "trailer" type vehicle behind the Lounge at approximately 3:00 a.m. He saw that the

lock that had been on the vehicle was broken into three pieces and was lying on the loading platform. Upon opening the door, Bunting observed that several cases of beer were missing and that other cases were stacked near the vehicle door. He closed the metal door leading to the rear of the Lounge and positioned himself so that he could see through a peephole in the door. A few minutes later, he saw three men taking beer from the vehicle. The men were 7 to 9 feet away from Bunting, who could see what brand of beer was being removed. He yelled to the trio, "Get the hell out of here." He then heard a shot and he fired twice through the peephole in the door. At the time Bunting first observed the broken lock, he dispatched a friend to call the police. He was unable to identify any of the persons that were removing the beer from the vehicle. Bunting, however, was able to relate that the trio fled in a "red or reddish" pickup truck. Officer Schaeffer said that he saw a relatively new "red" pickup leaving the area. He was afoot at the rear of the Lounge, in response to the call to the police, and momentarily lost sight of the truck when he ran to his police vehicle in order to pursue. He never thereafter lost sight of it. He stated that the closest he was able to get to the truck while in pursuit was approximately 700 feet. He knew that one of the three persons in the truck was shooting because he heard it and saw the pointed gun and "flash of gunfire," although he was unable to specifically identify the person who was doing the shooting.

Sergeant DiPino, in response to information he received over the radio, proceeded with Officer Malecki in an attempt to intercept the pickup. He saw the red pickup travelling at a high rate of speed. Officer Malecki, who was driving the police vehicle in which Sergeant DiPino was a passenger, "cut in front of the truck." As DiPino started to get out of the car "a shot came from the truck. And I'm saying I couldn't see exactly who was firing the shot, although I saw a flash. I heard the gunshot. The left window in our vehicle shattered at approximately the same time the shot was fired with glass splattering

onto me * * *. Another shot was fired as it approximately passed us and I fired two shots directly into the cab * * *." The truck sideswiped the police vehicle and continued on. A roadblock was set up at Sinclair Lane and Belair Road. The driver of the truck managed to get around the road block. The police located at the side of the barricade fired at the truck. Sergeant DiPino heard shots but was unable to distinguish whether they were from the police weapons, the people in the truck, or both. He did observe various police "scampering for cover" and the truck was emitting smoke. After the truck evaded the road block, Officer Hall and the vehicle containing Officer Malecki and Sergeant DiPino, continued the pursuit. "We were exchanging gun fire. And another shot came from the vicinity of the truck." The Sergeant said that "We were abreast of them. * * * We pulled to the right of the truck at which time I observed closely the people—only two that I saw in the truck." The appellant, Woodard, he said, was driving. "The other gentleman, Mr. Demby, was in the cab of the vehicle. * * * I could see him, Mr. Demby, coming up and the gun coming out the window and going back down." Officer Malecki rammed the truck with the police vehicle. "Before the vehicle even stopped I jumped from the vehicle and another shot came from the cab of the truck. And at this time I observed the driver, which is Mr. Woodard, with a gun in his hand," Sergeant DiPino said. Woodard was wounded. Demby was apprehended "as he was crawling over Mr. Woodard." The police found a .38 caliber snub-nosed revolver on the floor of the truck and a holster for the same on the person of Mr. Woodard. The third person in the truck was on the floor of the cab dead. Appellant Woodard was also found to have on his person four live .38 caliber cartridges. Sergeant DiPino, on cross-examination, said, "* * * shots were fired towards the vehicle" in which he was riding. "* * * I do know the gun was pointed our way and it was fired and his manner of aim—whether or not he was shooting at me or not—I felt like he was. That's the only reason why I returned the

fire." The police recovered only one gun, although Sergeant DiPino said that at one time he "saw both of them [Woodard and Demby] with guns."

Officer Hall informed the trial court that he, responding to a call, observed the truck. He said, "I had chased this truck from Moravia and Sinclair when I picked them up and I tried to pull the truck over to the side of the road. I had my siren on and my red light. As I got close to the truck and I pulled up alongside of the truck an arm would come over from the center of the truck holding a revolver." He was on the left hand side of the truck at the time, "That would be the driver's side of the truck, * * *." The truck "forced me into this pole and stop sign." After that the truck collided with Sergeant DiPino's car as a result of the ramming by Officer Malecki. Officer Hall identified both appellants as the persons he saw in the truck. He said that shots were fired at him from both the middle of the cab and the driver's side.

The appellant Woodard was indicated for (1) storehouse breaking, (2) assault with intent to murder Sergeant DiPino, (3) assault with intent to murder Officer Malecki, (4) assault with intent to murder Officer Hall, and (5) carrying a deadly weapon.

Demby was indicted on the same charges except for assault with intent to murder Officer Hall.

At the bench trial before Judge Grady in the Criminal Court of Baltimore, Woodard's motions to suppress evidence and to dismiss the indictments for lack of a speedy trial were overruled. Demby's motion to dismiss and grant appropriate relief was likewise denied.

At the conclusion of the State's case, the appellants moved for a judgment of acquittal which Judge Grady denied. Both appellants elected not to testify and renewed their motions which were again denied.

Appellants were found guilty and sentenced as follows:

As to Woodard: Indictment No. 968 — storehouse breaking, Article 27, §

32; sentenced to 10 years, concurrent with sentence in Indictment No. 969;

Indictment No. 969—assault with intent to murder Sergeant DiPino, sentenced to 15 years dating from January 16, 1970;

Indictment No. 970—assault with intent to murder Officer Malecki, sentenced to 15 years, concurrent with sentence in Indictment No. 969;

Indictment No. 971—assault with intent to murder Officer Hall, sentenced to 15 years, consecutive with sentence in Indictment No. 969;

Indictment No. 972—possession of a deadly weapon, counts 1, 3, 4 and 5, sentenced to 2 years, concurrent with sentence in Indictment No. 969.

As to Demby: Indictment No. 6281—assault with intent to murder Sergeant DiPino, sentenced to 12 years dating from January 16, 1970;

Indictment No. 6282—assault with intent to murder Officer Malecki, sentenced to 12 years, concurrent with sentence in Indictment No. 6281;

Indictment No. 6283, possession of a deadly weapon, counts 3, 4 and 5, 2 years concurrent with sentence in Indictment No. 6281;

Indictment No. 6285—storehouse breaking, counts 1, 2, 3, 4 and 5, sentenced as to count 1 only, 10 years concurrent with sentence in Indictment No. 6281.

On appeal, Woodard asserts that the lower court erred in (1) not dismissing the charges against him because he was denied a speedy trial, and (2) that the evidence was legally insufficient to convict.

Demby argues that the lower court erred in (1) convicting him of assault with intent to murder Officer Malecki, and (2) in convicting him of storehouse breaking, and (3) that the evidence was legally insufficient to convict him of any of the charges.

## I

### SPEEDY TRIAL

Woodard argues that Judge Grady should have dismissed all the indictments because the constitutional right to a speedy trial had been denied him. He, was arrested on January 16, 1970, and confined, after his release from the hospital, to the Baltimore City Jail, until December 1, 1970, a period of time 15 days short of 11 months. The record discloses that the indictments were filed on April 1, 1970. Arraignment was had on April 21, 1970. Counsel was appointed on April 27, 1970. The appearance of counsel and a motion for discovery and inspection were filed April 28, 1970. The State's answer to the motions was filed June 1, 1970. On November 13, 1970, appellant filed a motion to suppress. The State filed supplemental answers to the motion for discovery on November 20, 1970. The motion to dismiss for lack of speedy trial was filed by Woodard on November 24, 1970. Trial was held on December 1, 1970. Counsel for Woodard contends that the case was set for trial on July 7, October 28 and November 19, 1970, and on each date was postponed by the State.

At the hearing on the motion to dismiss, Woodard offered no testimony. The transcript reveals that counsel alleged in his motion that he "had lost control of some of our witnesses because of what had happened in the courtroom that afternoon." He, however, candidly, advised Judge Grady that "* * * those witnesses * * * are in the courtroom today."

In *Barnett v. State*, 8 Md. App. 35, 39 (1969), we held that:

> "The right to a speedy trial is a relative one and the time within which trial must be had to satisfy the guaranty depends on the facts and circumstances of the particular case. *Kelly v. State*, 2 Md. App. 730. Four factors are relevant to a consideration of these facts and circumstances in determining whether a delay in trial assumes constitutional proportions: (1) the length of the delay; (2) the reason for the delay; (3) prejudice to the accused; and (4) waiver of the right by the accused."

The first indication of appellant's [Woodard] desire for a speedy trial appears in his motion to dismiss filed on November 24, 1970, although he asserts that he communicated his request for a speedy trial to Judge Harris on November 19, 1970.[1] Appellant has shown no prejudice as a result of the delay. All of the witnesses that he apparently desired were present. Trial actually occurred within 12 days of his oral notice of his desire for a speedy trial and within 7 days of the written motion.

We cannot find under the circumstances of this case any denial of the constitutional right to a speedy trial. See *Tunstall and Alton v. State*, 12 Md. App. 723 (1971).

## II

### ASSAULT WITH INTENT TO MURDER

The crime of assault with intent to murder embodies

---

1. November 19, 1970 is one of the dates appellant's counsel says the case was postponed.

the element of malice leading to a charge of murder if death should ensue. *Marks v. State*, 230 Md. 108, 112 (1962). The test for assault with intent to murder is that the crime would be either murder in the first or second degree if the victim dies. This Court in *Simms v. State*, 4 Md. App. 160, 168 (1968), said:

> "Assault with intent to murder is a felony. Md. Code (1967 Repl. Vol.), Art. 27, § 12. Intent is the essence of that felony and if the intent was carried out, the resulting crime would have had to be either first or second degree murder. *Marks v. State*, 230 Md. 108, 112. But a specific intent to murder is not a necessary element for conviction of assault with intent to murder. It is sufficient if there was an intention to commit grievous bodily harm. *Lawrence v. State*, 2 Md. App. 736, 738.
>
> "The essential distinction between murder and manslaughter is the presence or absence of malice, which is the intentional doing of a wrongful act to another without legal excuse or justification. The inference of malice may be drawn from the fact of the use of a deadly weapon directed to a vital part of the body. *Chisley v. State*, 202 Md. 87, 95 A. 2d 577. The law presumes that in the absence of mitigation, all homicides are committed with malice and constitute murder. This presumption also applies to cases of assault with intent to commit murder." *Tate v. State*, 236 Md. 312, 317. See also *Cook v. State*, 9 Md. App. 214, 218 (1970), *Lindsay v. State*, 8 Md. App. 100, 104 (1969), *Perez v. State*, 7 Md. App. 452, 454 (1969).

Appellants contend that there was no evidence upon which the trial judge could ground his belief that there was an intent to commit grievous bodily injury upon police officers DiPino, Hall and Malecki. Both appellants assert that the evidence fails to show that the use of a

deadly weapon was directed at a vital part of the officers' bodies.

The evidence permitted an inference by the trial judge that the appellants were shooting at the police officers with intent to murder or wound them. Certainly, the police were under that impression. Judge Grady could justifiably conclude that only the poor marksmanship of the appellants prevented the more serious charge of murder. We do not think it was a "physical impossibility," as appellants argue, for them to have "pointed a weapon at any of the vital parts of the bodies of these officers in view of the * * * high speed." It is apparent from the record that the appellants were shooting at the police in a helter-skelter fashion and that the gunfire was being returned. They were engaged in a running gun battle, in which one of their number was slain.

The uncontradicted testimony of the police officers was that they were being shot at by persons in the pickup truck. The use of a deadly weapon infers malice. *Tate v. State, supra.* Likewise, the shooting at a vital part of the body infers intent to murder. *Wells v. State,* 8 Md. App. 510 (1970). "Evidence showing that a deadly weapon such as a gun was pointed toward a human being and discharged in the general direction of that human being in a random fashion is sufficient to support inferences of both malice and intent to do grievous bodily harm." *Mahoney v. State,* 13 Md. App. 105. There was legally sufficient evidence from which the trier of the facts could infer that the shooting by appellants at the police was directed toward vital parts of the respective officers' bodies with intent to do grievous injury. In Clark & Marshall, *Crimes,* 7th Ed., § 5.03, it is stated:

> "If a person deliberately, and without ignorance of fact, shoots in the direction of another, it will be presumed that he intended to kill him, and he may be convicted of murder, or assault with intent to murder, according to the result."

Intent to kill and premeditation may be inferred from

the intentional use of a deadly weapon in a deadly manner. 1 Wharton, *Criminal Evidence*, 12th Ed., § 131.

Appellants contend that Judge Grady erred in convicting them of assault with intent to murder Officer Malecki because Malecki did not testify and there was no showing by the State that he was not able to do so.

Officer Malecki's non-appearance at the trial is not fatal to the conviction of assault with intent to murder him. There was enough credible evidence, if believed, from Sergeant DiPino of the circumstances surrounding the shooting out of the window glass near Malecki, to sustain the conviction. Obviously, if Officer Malecki had been shot and killed or wounded so as to be mentally or physically incompetent, he could not have been present at the trial. We need not speculate as to why he was not present. The better practice would have been for the State to have required his attendance.

The test for the sufficiency of the evidence is "whether the evidence, if believed, either shows directly or supports a rational inference of the facts to be proved, from which the court could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt." *Coward v. State*, 10 Md. App. 127, 130 (1970), *Jones v. State*, 5 Md. App. 180, 186 (1968). We think the evidence legally sufficient to sustain the conviction of an assault with intent to murder and the deadly weapons charge.

## III

### *BREAKING INTO A TRAILER*

"We should have a great many fewer disputes in the world if words were taken for what they are, the signs of our ideas only, and not for things themselves." [2]

Article 27, § 32, provides:

"Every person, his aiders, abettors and counsellors, who shall be convicted of the crime of

---

2. Locke, "Essay on the Human Understanding." (1690).

breaking a storehouse, filling station, garage, *trailer,* cabin, diner, warehouse or other out-house, or into a boat in the day or night with an intent to commit murder or felony therein, or with the intent to steal, take or carry away the personal goods of another of the value of one hundred dollars ($100.00) or more therefrom, shall be guilty of a felony, and upon conviction sentenced to the penitentiary for not more than 10 years." (Emphasis supplied).

It is argued to us that appellants cannot be convicted of "storehouse breaking" because the indictments do not aver that the trailer was a storehouse or part of a building. It is contended that the "trailer" was in reality a "semitrailer"—a motor vehicle—and that a motor vehicle is not embraced by section 32, *supra.* The indictments charged that appellants "* * *, unlawfully did break into the trailer of Ronald E. Bunting there situate, at 6067 Moravia Park Drive, rear, with intent to feloniously steal, take and carry away therefrom the goods, chattels, monies and properties * * *." Cross-examination of Mr. Bunting revealed the following:

"Q.  * * * Now, for what purpose is this vehicle normally used, just to transport beer?

A.  *No, in fact, it is not used for that at all now. It is to hold supplies that I use in the place outside of any alcoholic beverage. At that time it was alcoholic beverages in it.*

Q.  Is there a tractor attached to it?

A.  No, there isn't.

Q.  How many axles does this vehicle have?

A.  It's a — its tandem.

Q.  Then it's not a trailer. It's a semi-trailer. Wouldn't that be an accurate description?

A.  No. I'd call it a trailer. It's a thirty-two foot trailer—I think thirty-two. It might be longer.

\* \* \*

Q.  Where you back a tractor up under it? It's what we call the fifth wheel, isn't that correct?

A.  Fifth wheel.

Q.  That would make it a semi-trailer, right?

MR. FISHER: I object. He's arguing with the witness as to the terminology.

MR. BRISCOE: I am trying to get a picture. It's his vehicle.

THE COURT: He's given you a description. What the label is, I think, is another question.

MR. BRISCOE: I think it's a pertinent question, Your Honor, as to the charge in this case.

THE COURT: He's told you.

THE WITNESS: I don't know what the nomenclature is of these vehicles.

MR. BRISCOE: But, the other end does have this fifth wheel that attaches to a tractor so it can pull it?

A.  Yes, uh huh.

Q.  I see.

THE COURT: Now, when we are talking about the other end as it is located there, Mr. Bunting,

it would have two wheels that it sits on?

THE WITNESS: It has the trailer wheels down, the metal wheels. I don't know what these are called either.

THE COURT: It doesn't ride on those, they just hold it up when it's not being driven?

THE WITNESS: Just hold it up, right."
(Emphasis supplied).

Appellant's contention that the trailer in this case is really not a trailer, but a "semitrailer" and therefore not covered by the criminal statute, while original, presupposes that the motor vehicle code and the criminal code are to be read in *pari materia*. They are not.

Legislative intent is to be garnered in the first instance from the words used in the statute, and these words are to be afforded the meaning naturally given to them in ordinary usage. *Blake v. State*, 210 Md. 459, 462 (1956). Applying the principle of *ejusdem generis* to section 32, *supra*, it seems apparent that when the legislature used the word "trailer" it gave to it a generic meaning so as to include the type of trailer involved in the instant case.

*Judgments affirmed.*