# ROBERT AVON JAMES *v.* STATE OF MARYLAND

[No. 519, September Term, 1971.]

*Decided March 21, 1972.*

The cause was submitted on briefs to MURPHY, C.J., and ORTH and GILBERT, JJ.

Submitted by *Harvey J. Siegel* and *John D. Hackett* for appellant.

Submitted by *Francis B. Burch, Attorney General, James G. Klair, Assistant Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Joseph B. Harlan, Assistant State's Attorney for Baltimore City,* for appellee.

GILBERT, J., delivered the opinion of the Court.

Robert Avon James, appellant, was convicted of second degree murder in the Criminal Court of Baltimore by a jury presided over by Judge Albert L. Sklar. Appellant was sentenced to a term of confinement of 30 years under the jurisdiction of the Department of Correctional Services. On appeal from the judgment of the Criminal Court, appellant asserts that the trial court erred in three respects concerning the validity of his trial.

    I. Sufficiency of the evidence.

    II. Improper jury instructions.

III. Prejudice to appellant's right to a fair and impartial trial occasioned by the substitution of a regular juror during the course of the trial.

## THE FACTS

Officer Lloyd Swedenjelm was operating his patrol car in the 1300 block of North Fremont Avenue when he observed a woman, later identified to be Mrs. Lillian Jones, bending over the prostrate body of James Melvin Baltimore. Standing near Mrs. Jones were two of her children, Robert and Robin. When the officer observed that the man was bleeding from the chest, he radioed for an ambulance. During this period of time, an unidentified man was applying mouth-to-mouth resuscitation, and he continued to do so until the ambulance arrived. The officer searched the scene for a weapon but found none. He examined a trail of blood leading from 1314 North Fremont Avenue, where Mr. Baltimore was lying, to 1310 North Fremont Avenue. Mr. Baltimore expired from the chest wound shortly after his removal from in front of 1314 North Fremont Avenue. The autopsy report indicated that Mr. Baltimore's death was caused by a single slightly downward stab wound above the right chest nipple, approximately two inches deep.

Based upon information gathered by the police officer, a warrant for the arrest of the appellant was obtained on December 20, 1969, and the appellant surrendered himself three days later.

At the trial, Lillian Jones testified that she had lived with the decedent for a period of time at 1320 North Fremont Avenue. She told the jury that on the night of December 19 and continuing into the morning hours of December 20, 1969, her mother, Vivien Floyd and Luther Ford were socializing in the club basement. She said that the appellant was asleep on the first floor in a living room chair when he was awakened by the appellant's mother who told him that she and her sister had been struck by Mr. Baltimore. This statement, however, was contradicted by the mother, Mrs. Wooden, and by the

appellant. According to Mrs. Jones, an argument ensued in which a number of verbal epithets and pejoratives were exchanged among Mrs. Jones, the appellant, and the decedent. Mrs. Jones stated that the appellant hit her in the eye, and as she fell to the floor she broke a glass on the inside of the vestibule door. The brawl spilled out onto Fremont Avenue, and there was testimony that Mr. Baltimore had a "club" in his hand and was chasing the appellant. The appellant states that he was struck with the club by the decedent a number of times, but his testimony was unsupported by others. Appellant successfully evaded the decedent.

Miss Robin Jones, the 10 year old daughter of Mrs. Jones, testified as follows:

"Q Tell me what you saw.
A I seen Mr. Baltimore went around the corner.
Q Went around the corner? Then what happened? Do you know why he went around the corner?
A No.
Q Then what happened?
A Then, so he came back, he crossed the street and my uncle [appellant], he came up the street.
Q He came up the street? Was he in front of Mr. Jimmy [Mr. Baltimore] or behind him?
A Behind him.
Q What did you see him do?
A Mr. Jimmy, he stopped, said something to my uncle. He stopped too.
Q Where was he when he stopped? Was he in front of Mr. Jimmy or behind him?
A Behind him.
Q What did he do? Take your time. I know this is difficult. Just tell the ladies and gentlemen of the jury exactly what . . .
A That he jumped out and stabbed him.

Q Where did he stab Mr. Baltimore, Mr. Jimmy?

A Right up here.

Q When he did it, where was he standing, in front or behind him?

A He just jumped out. He was behind him at first.

* * *

"Q Now, at that time, did you see Mr. Jimmy have anything in his hands?

A Yes.

Q What did he have?

A A club.

Q How long was it, do you remember?

A No.

* * *

"Q * * *. Did you see what was in Mr. James' hand when he came around?

A Which one?

Q In Mr. James', your uncle. What was in your uncle's hand when he came from behind on Mr. Baltimore?

A A knife.

* * *

"Q What happened after you saw your uncle stab Mr. Jimmy? What did Mr. Jimmy do?

A He staggered down the street in front of the Club."

On cross-examination, the young lady said that the fighting outside had stopped at one point. She was not asked and did not testify whether or not the decedent struck the appellant with the club. The appellant, in his own defense, testified that he was struck repeatedly prior to the time of the stabbing and that the stabbing was done in self-defense.

There was some testimony from Vivien Floyd that the decedent earlier in the morning had been in possession of a butcher knife and a club, although there was testi-

mony that the decedent stuck the butcher knife in the cellar stairs and then went upstairs, leaving the knife.

I

The test to be applied in determining the legal sufficiency of the evidence in a criminal case is whether the admissible evidence adduced at trial shows directly or supports a rational inference of the facts to be proved, from which the jury could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged. *King v. State,* 14 Md. App. 385, 287 A. 2d 52; *Frankis v. State,* 11 Md. App. 534, 275 A. 2d 532 (1971) ; *Williams and McClelland v. State,* 5 Md. App. 450, 247 A. 2d 731 (1968).

Where there is legally sufficient evidence for the veniremen to find that the intent on the part of the defendant was to kill or inflict grievous bodily harm upon the deceased, a verdict of second degree murder is supported. *King v. State, supra.* In the absence of evidence to the contrary, a person is presumed to intend the natural and probable consequences of his acts. *Lindsay v. State,* 8 Md. App. 100, 258 A. 2d 760 (1969).

The use of a deadly weapon directed at the vital parts of another's body is sufficient to infer malice. *Woodard and Demby v. State,* 13 Md. App. 114, 282 A. 2d 9 (1971) ; *Mahoney v. State,* 13 Md. App. 105, 281 A. 2d 421 (1971) ; *Carroll v. State,* 11 Md. App. 412, 274 A. 2d 677 (1971) ; *Cook v. State,* 9 Md. App. 214, 263 A. 2d 33 (1970) ; *Lindsay v. State, supra.*

The Annotated Code of Maryland (1971 Replacement Volume), Article 27, § 407, provides:

"All murder which shall be perpetrated by means of poison, or lying in wait, or by any kind of wilful, deliberate and premeditated killing shall be murder in the first degree."

Article 27, § 408, concerns itself with murder committed in the perpetration of arson; § 409 with murder committed in the burning of specifically designated struc-

tures; § 410 sets forth what is generally termed the "felony murder" rule. All other kinds of murder are deemed to be second degree murder, § 411.

Significantly, Article 27, § 412, provides:

> "And the jury before whom any person indicted for murder shall be tried shall if they find such person guilty thereof ascertain in their verdict whether it be murder in the first or second degree; * * *."

The only other known eyewitness to the slaying, besides the appellant, told the jury, as we have indicated herein, that she saw her uncle, the appellant, plunge the knife into Mr. Baltimore's chest. This testimony, standing alone, if believed by the jury, was sufficient to sustain the conviction of second degree murder.

The verdict of the jury in this case is indicative of the jury's belief of the testimony presented by the State, and not that of the appellant and his witnesses. The jury was not required to believe the appellant's exculpatory statement of self-defense. *Derricks and Hilgeman v. State,* 9 Md. App. 261, 263 A. 2d 597 (1970); *Cleveland v. State,* 8 Md. App. 204, 259 A. 2d 73 (1969); *Rasnick v. State,* 7 Md. App. 564, 256 A. 2d 543 (1969).

The weight of the evidence and the credibility of the witnesses are matters within the province of the jury. *Collins v. State,* 14 Md. App. 674, 288 A. 2d 221 (1972); *Williams v. State,* 11 Md. App. 350, 274 A. 2d 403 (1971); *Reid v. State,* 10 Md. App. 6, 267 A. 2d 332 (1970); *David v. State,* 1 Md. App. 666, 232 A. 2d 553 (1967); *Williams and McClelland v. State, supra;* Rule 1086.

## II

Appellant argues that the trial judge's advisory instructions to the jury included a definition of first degree murder, and a distinction between that offense and second degree murder. This, appellant says, was error in view of the trial judge's having granted a motion for judgment of acquittal as to first degree murder. Appellant avers that he objected to the instructions.

Our perusal of the record fails to reveal any such objection being made known to Judge Sklar until the hearing on the motion for a new trial.

Rule 756 f provides:

"If a party has an objection to any portion of any instruction given, or to any omission therefrom, or to the failure to give any instruction, he shall before the jury retires to consider its verdict make such objection stating distinctly the portion, or omission, or failure to instruct to which he objects and the ground of his objection. Opportunity shall be given to make the objection in open court out of the hearing of the jury upon application either orally or in writing, made before or after the conclusion of the charge."

Paragraph g of the same Rule states:

"Upon appeal a party assigning error in the instructions may not assign as of right an error unless (1) the particular portion of the instructions given or the particular omission therefrom or the particular failure to instruct was distinctly objected to before the jury retired to consider its verdict and (2) the grounds of objection were stated at that time. Ordinarily no other error will be considered by the Court of Appeals or the Court of Special Appeals, but the appellate court, either of its own motion or upon the suggestions of a party may take cognizance of and correct any plain error in the instructions, material to the rights of the accused even though such error was not objected to as provided by section f of this Rule."

The appellant's contention concerning Judge Sklar's charge is not properly before us in view of his failure to comply with Rule 756. No remonstration was made by appellant, in compliance with the Rule, to Judge Sklar's

instructions, and, as we have stated, no objection was made in any event until the hearing on the motion for a new trial. *Anderson v. State,* 12 Md. App. 186, 278 A. 2d 439 (1971); *Vernon v. State,* 12 Md. App. 157, 277 A. 2d 635 (1971); *Jones v. State,* 9 Md. App. 455, 265 A. 2d 271 (1970); *White v. State,* 8 Md. App. 51, 258 A. 2d 50 (1969). However, we have carefully examined Judge Sklar's advisory instructions and they, when read as a whole, clearly and concisely set forth the applicable law regarding the "three possible verdicts: (one) guilty of murder in the second degree; * * * (two) guilty of manslaughter; and (three) not guilty."

The jury was specifically told that they were not to consider first degree murder. There is no "plain error in the instructions, material to the rights of the accused. * * *" *Brown v. State,* 14 Md. App. 415, 287 A. 2d 62 (1972); *Epperson v. State,* 7 Md. App. 464, 256 A. 2d 372 (1969); *Anderson v. State, supra; Vernon v. State, supra;* Rule 756 g, *supra.*

## III

Lastly, appellant contends that the unexplained removal of a regular juror during the course of the trial operated so as to "prejudice appellant's right to a fair trial" since the jury might infer that the appellant had influenced or threatened the removed juror, and such an inference would be highly prejudicial.

When the jury was impaneled, two supernumeraries were added pursuant to Maryland Rule 748. All of the regular twelve jurors and the two alternates were examined on *voir dire.* One of the questions posited by defense counsel below, and accepted by the court, was, "Have you ever served as a Juror in any criminal case in a State or Federal court?" There was some positive response to the question, but one of the jurors, a woman, did not affirmatively answer although it appears that she had served as a juror previously in another criminal case. This matter was called to the attention of the Assistant State's Attorney at the noon recess on the sec-

ond day of the trial by the Assistant Jury Commissioner. The Assistant State's Attorney said that at that time he thought the Commissioner was talking about a different juror who had been excused for cause. On the morning of the third day of the trial, the Assistant State's Attorney, Joseph B. Harlan, called the matter to the attention of Judge Sklar and suggested that the juror be removed "for cause" because of her prevarication and "possible perjury."

Appellant's counsel objected strenuously to the substitution of an alternate and moved for a mistrial. Judge Sklar promptly denied the motion. Actually, alternate No. 2 was substituted for the regular juror because the first alternate was ill and did not attend the trial on the third day.

Here, appellant's line of reasoning takes the following form:

> "The vested jury of 12, when proclaimed acceptable to both State and defense, becomes a unity of deliberation. In protracted trials, alternates are selected to act as jurors in case of death, sickness or unavoidable absence of a vested juror. They are not part of the unity which must deliberate and have no say unless seated under the specific events causing absence. To order a juror out of the jury box is to declare mistrial because the unity ceases to exist."

Appellant concludes by averring that the trial judge erred in denying his motion for a mistrial based on the allegedly prejudicial substitution.

Rule 748 of the Maryland Rules of Procedure, entitled "Jurors-Alternate," provides in pertinent part:

> "The court may direct that not more than two jurors in addition to the regular jury be called and impaneled to sit as alternate jurors. *Alternate jurors * * * shall replace jurors, who, prior to the time the jury retires to con-*

*sider its verdict, become unable or disqualified to perform their duties.* An alternate juror shall be drawn in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges, shall take the same oath, and shall have the *same functions, powers, facilities, and privileges as the regular jurors.* An alternate juror who does not replace a regular juror shall be discharged when the jury retires to consider its verdict. For each alternate juror to be selected, the State shall be entitled to one additional peremptory challenge * * *, and each defendant shall be entitled to two additional challenges. * * *."
(Emphasis supplied).

It is pellucid that Maryland's supernumerary juror rule provides for a substitution or replacement of regular jurors by alternates up to the juncture occurring when the jury retires to deliberate its verdict. There is no provision in this State's rule for substitution of an alternate juror thereafter. See *United States v. Hayutin,* (C.A.2 N. Y.), 398 F. 2d 944, cert. denied 393 U. S. 961, 89 S. Ct. 400, 21 L.Ed.2d 374 (1968), where it was held to be mandatory that an alternate juror who does not replace a regular juror "shall be discharged after the jury retires to consider the verdict." This reasoning appears to be the rule in Maryland.

Our rule does not define the circumstances under which a juror shall "become unable or disqualified" to perform his duties and each case must stand on its own facts. Though the directive of the Maryland rule,—"shall replace jurors"—is couched in mandatory terms, it is obvious that the word "shall" as used therein is directory. Thus, the substitution *vel non* of a supernumerary for a regular juror lies within the sound discretion of the trial judge. Such an exercise of discretion will not be disturbed on appeal unless arbitrary and abusive in its application.

At common law, according to the established prece-

dents, when, during a trial, a defect in jurors occurred because of the death, illness, or misconduct of a juror or other cause necessitating his discharge, the practice was to discharge the entire jury and begin *de novo* by forming a new jury panel. Eleven of the twelve discharged jurors were immediately recalled, an alternate juror was seated, replacing the excused juror, thus completing the twelve. The new jury was then impaneled *de novo,* allowing the full number of challenges with respect to the eleven jurors recalled, as well as with respect to the new juror. The common law right of trial by jury, as guaranteed by constitutional provisions, is not impaired by legislation that provides only for the discharge of an incapacitated juror, and the calling of a substitute juror to be sworn and impaneled. See Annotation, *"Constitutionality and construction of statute providing for substitution or replacement of individual juror during trial"; Beal v. Southern Union Gas Co.,* 66 N. M. 424, 349 P. 2d 337 (1960) and Annotation, *"Constitutionality and construction of statute or court rule relating to alternate or additional jurors or substitution of jurors during trial,"* both in 84 A.L.R.2d 1288 (1962) and plethora of caselaw cited therein.

To avoid the effect of the common law rule, various states have enacted alternate juror statutes and promulgated Rules of Court providing for the selection of extra or alternate jurors to be used during a trial if any of the regular jurors are excused for cause. 70 A.L.R. 188 (1931), *supra;* 84 A.L.R.2d 1288 (1962), *supra.*

In *People v. Peete,* 54 Cal. App. 333, 202 P. 51 (1921), it was contended that California's alternate juror statute, similar to Maryland Rule 748, was unconstitutional in that it deprived a defendant of his right to a trial by jury as known to the common law. Even though in *Peete* the attack was directed against the constitutionality of the statute, we feel that the rationale of *Peete* is fully dispositive of the contention raised by the appellant in the instant case. The California Court held that the stat-

ute was constitutional, and after stating that the three elements of a jury trial were number, impartiality, and unanimity, said:

"Clearly, the section does not affect the first of the three essential attributes of a jury trial, —number. As we already have pointed out, the trial is by a jury of twelve in every essential particular. Twelve persons, neither more nor less, determine the issues of fact and render the verdict. The same twelve by whom the verdict is rendered have seen and heard, with equal opportunities, all the witnesses in the case, have received the same court instructions, and, under the same legal sanctions, have had imposed upon them the same obligation well and truly to try the matter in issue. It seems clear that the section cannot affect the second essential of a jury trial,—impartiality. The juror who, up to the time when he replaces the dead or incapacitated juror, has sat throughout the trial as an 'alternate,' hearing and seeing all of the witnesses, has been chosen as such alternate only after an examination as to his qualifications, subject to the same challenges as the other jurors, and, upon his being selected as an alternate—i.e., before the introduction of any evidence whatever—he has taken the same oath that was taken by the other jurors—an oath well and truly to try the matter in issue and a true verdict render according to the evidence. * * * We may not assume that an 'alternate,' merely because he is conscious that it is possible that he may never be required finally to decide the case as one of the twelve by whom the verdict is rendered, will violate his oath and pay less heed to the evidence than he would if he were impaneled as one of the regular jurors from the inception of the trial. On the contrary,

we must assume that he will obey his oath, and that he will well and truly try the matter in issue, as he has sworn to do, just as he would if he were one of the original twelve jurors. Every safeguard that the law has thrown around the regular jurors to insure an impartial verdict, * * * the alternate juror is surrounded with from the commencement to the end of the trial. Nor can [the statute] affect the third of the three essentials of a jury trial,—unanimity. The verdict still must be unanimous verdict of the twelve jurors to whom the case is finally submitted, even though one of them, before taking the place of the incapacitated juror, sits as an 'alternate.' "

See also *People v. Abbott,* 47 Cal. 2d 362, 303 P. 2d 730 (1956), where it was held that there was no abuse of discretion by the trial judge when he determined that there was good cause for discharging a juror and substituting an alternate who had been previously selected with the regular jury. The California Supreme Court, *en banc,* pointed out that there was no showing that the defendant was prejudiced, since he was not entitled under the Federal Constitution or any other law to be tried by a jury composed of any particular individuals. Further, the substituted juror had been fully examined by both sides on *voir dire* and accepted as a qualified alternate. There was no claim that he was unable to render a fair verdict. .

A similar holding is found in *People v. McManus,* 180 Cal. App. 2d 19, 4 Cal. Rptr. 642 (1960). There the California District Court of Appeals, Fourth District, rejected a contention that the dismissal of the regular juror was prejudicial error. It was pointed out that in matters of this kind, discretion must necessarily be vested in the trial judge. Neither abuse of discretion nor prejudice to the defendant had been shown by the record.

The Mississippi Supreme Court held in *Russell v. State,* 220 So. 2d 334 (Miss. 1969), that a trial court did not abuse its discretion in overruling a defendant's motion for a mistrial absent a showing of prejudice to a defendant, where the court had called an alternate juror to replace a regular juror.

The decision as to whether to grant or to refuse a motion for a mistrial is within the sound discretion of the trial court. *Killie v. State,* 14 Md. App. 465, 287 A. 2d 310 (1972) ; *Parker v. State,* 7 Md. App. 167, 254 A. 2d 381 (1969) ; *Holbrook v. State,* 6 Md. App. 265, 250 A. 2d 904 (1969) ; *Matthews v. State,* 3 Md. App. 555, 240 A. 2d 325 (1968).

The weight of authority indicates, and the cases are legion, that, absent a showing of prejudice and an abuse of discretion, the conduct of the trial judge in substituting a supernumerary for a regular juror will not be reversed on appeal. Appellant's inability in the instant case to successfully demonstrate prejudice and abuse mandates that the judgment shall be, and it hereby is, affirmed.

*Judgment affirmed.*