JOHN CLARKE DEAVER AND FRANK
DIGIOIA *v.* STATE OF
MARYLAND

[No. 632, September Term, 1975.]

*Decided February 3, 1976.*

The cause was submitted on briefs to MORTON, MELVIN and
MASON, JJ.

Submitted by *Michael J. Lambros* for appellant Deaver.
Submitted by *Russell J. White* and *Robert N. Dugan* for
appellant Digioia.

Submitted by *Francis B. Burch, Attorney General, Gilbert*

*Rosenthal, Assistant Attorney General, Sandra A. O'Connor, State's Attorney for Baltimore County,* and *Steven J. Scheinin, Assistant State's Attorney for Baltimore County,* for appellee.

MELVIN, J., delivered the opinion of the Court.

On May 8, 1975, after a non-jury trial in the Circuit Court for Baltimore County, the appellants, John Clarke Deaver and Frank Digioia, were found guilty of armed robbery. In this appeal they contend the evidence presented to the trial judge was not sufficient to support the guilty verdicts. We agree and shall vacate the judgments of conviction.

The scope of our review in assessing the sufficiency of the evidence in a non-jury case is governed by Maryland Rule 1086 which plainly commands that we cannot reverse the judgments of the trial court on the evidence unless we find the judgments to be clearly erroneous. *Szewczyk v. State,* 7 Md. App. 597 (1969). The test as to whether the trial judge was clearly erroneous in reaching a guilty verdict is whether admissible evidence showed either directly, or circumstantially, or supplied a rational inference of, the facts to be proved from which the trier of fact could fairly be convinced beyond a reasonable doubt of the accused's guilt of the offense charged, with due regard being given to the opportunity of the lower court to judge the credibility of the witnesses. *Robinson v. State,* 17 Md. App. 451 (1973).

## The Evidence

Lillian Tenney, an employee of the Budget Bakery shop located on East Joppa Road in Baltimore County, testified that on Thursday, June 27, 1974, at approximately 5:00 P.M., "two young boys" entered the shop. One boy had a package of buns in his hands, "and he laid them on the counter". The other boy "came around the counter behind me", produced "a small gun" and said, "This is a holdup". The boy with the gun then "went right to the desk, and right to the middle drawer — and he didn't go through all the drawers — if he knew just what he was doing, and he opened

the middle drawer, and we had a white envelope there where we keep our money from the register that we go down and get out money orders at the end of the day, and he just reached in and took the envelope and ran around the partition, and both of them took off." $190.00 was in the envelope in "tens, twenties, fives and ones". The extent of Mrs. Tenney's description of the boys was that they "wore dungarees, tennis shoes", and "both had hair down to their collars", and the one without the gun "had large mirrored sunglasses on". When shown a pair of sunglasses, she said they were "the same type". The sunglasses were marked State's Exhibit No. 1 "for identification only". She testified to no other identifying details such as weight, height, color of hair or approximate ages of the "young boys". She did not identify the appellants at the trial as the robbers.

The next witness for the State was Mary Elizabeth Joynes, between 10 and 12 years old, who testified that at approximately 5:00 P. M. on June 27, 1974, she was walking in Yakona Alley. Later testimony indicated the alley to be between one and two blocks from the Budget Bakery. She saw "two boys" run down the alley and heard one of them say, "Hit the gas". One of them had a "light brownish" envelope in his hand. The two boys then got into the back seat of a green Volkswagen automobile. Two other "men" were already in the front seat of the Volkswagen and it drove off "rather fast". One of "the two men" that ran down the alley was wearing mirror sunglasses. State's Exhibit No. 1 for identification was the "same type". The driver and the front seat passenger had "bigger sunglasses on". Miss Joynes described the driver of the car as having "frizzy hair, like, like it was about came to right about here, and it was, like, frizzy. . . . "

She testified to no other description of the four individuals she saw in the alley. She was asked by the prosecutor "to look around the courtroom, and tell the Court if you see any of the four men that you saw on June 27, 1974". She responded, "Yes, I can, one of them" and pointed out the appellant Deaver. When asked, " . . . [w]hich one of the four boys would he be?", she replied, "I think he was the one who

came running down the alley". On cross-examination she was asked:

"Q. This offense occurred back on June 27th, 1974, almost a year ago. Since that time, have you seen any of these parties?

A. I thought I did, but I am not sure, really, sure".

She further testified that she had been unable to identify any of the boys from "some pictures" shown her by the police, although she had "thought" she could identify one of them but she "wasn't sure". She was not asked which one she "thought" she could identify from the pictures.

Detective James Neuner of the Baltimore County Police Department testified that shortly before 8:30 P. M. on June 27, 1974, he arrested Deaver for the robbery. He was led to Deaver by the license number of the Volkswagen supplied to him by Miss Joynes. The car was registered in Deaver's name. After being advised of his Miranda rights, Deaver told Detective Neuner and Sergeant Gary Witt of the Baltimore County Police Department "that he and another named subject, the other defendant, Digioia, were in the alley [where Miss Joynes saw the Volkswagen] waiting for two other boys, and that the two boys came running down to the automobile hurriedly, and said that 'Let's step on it, let's go' ". Deaver and Digioia were "already in the car" when the two boys ran up to it. The police report indicated that at the time of his arrest Deaver had $17.41 in his possession, including one ten dollar bill and seven one dollar bills.

Sergeant Witt testified that Deaver told him that he and Digioia were in the alley in the parked car at approximately 5:00 P. M. on June 27, 1974, "and two subjects came down the alley, got into the car. Digioia told him to pick them up, and they proceeded on around the alley and out".

Digioia was arrested shortly before 10:05 P. M. on June 27, 1974, at which time he had $27.00 in his possession — "two tens and seven ones". At that time he denied being with Deaver in the alley, saying that although he had been with Deaver from 1:30 P. M. to 3:30 P. M. he "hadn't seen Deaver anymore that day". The next day, however, after

consultation with counsel he gave a written statement to Detective Corporal Dennis Neugent of the Baltimore County Police Department. The statement was read into evidence without objection. The statement was as follows:

"I woke up, approximately, 12:00 or 12:30, and called Norman McDermitt around 12:45. I walked to Norman's house, and stayed till around 1:15. Went home and ate lunch. About 1:30, Johnny Deaver and Norm and Chris and Mike drove up. We then went to Loch Raven Dam and drank beer till 3:45 to 4:15. We all left, and John Deaver dropped me off at my house. About 4:50 that evening, Chris and John and Mike came back to my house, drove up to Oakleigh Road and finished the beer. Chris said, "I'm going to get some money, be back in a minute," while we were parked behind A & P on Joppa Road. Five minutes later, Chris and Mike came running back to the car saying, "Let's get lost." I then realized something was wrong, and I told Johnny to drop me off at my house. I arrived home about 5:15, and ordered one quarter barrel of beer from Rau's; waited at my house until about seven until beer arrived; then went down to Norman's house and drank until I was arrested.

Question: Did you have any idea that a holdup was planned?

Answer: No.

Question: Did you, yourself, participate in the holdup?

Answer: No.

Question: Do you know who Mike and Chris are?

Answer: No.

Question: Have you ever participated in a holdup or robbery before?

Answer: No.

Question: Have you told us everything you have been involved in?

Answer: Yes.

Question: Did you see or receive any money from the holdup?

Answer: No, I didn't receive any money, but I saw an envelope with money in it.

Question: Describe Mike, Chris.

Answer: Yes. Both about five foot ten inches, dark brown hair. Mike has short brown hair. Chris has shorter length hair. Both about one hundred fifty pounds. Both wearing blue jeans. Mike had sunglasses.

Question: Did Deaver go right to the alley or did Mike and Chris tell him where to go?

Answer: Mike and Chris told him where to go.

Question: Did Mike or Chris ever mention the bakery?

Answer: No.

Question: Would you assume that Deaver had previous knowledge of where Mike and Chris were going to get the money?

Answer: No.

Question: Why?

Answer: I don't think it was ever mentioned in the conversation.

Question: Is there anything else you can add to this statement?

Answer: No."

Maude Kieth testified on behalf of Digioia that she was working in the Budget Bakery at about noontime on June 27, 1974. She noticed four boys "in and out" of the shop at that time. They were all not in the shop at the same time. None of them were in the shop when she went behind the counter to the desk where she opened the desk drawer to change a twenty dollar bill for a woman customer. She said, " . . . I opened the drawer, and that's where we keep a brown envelope, well, it's really a brown manila envelope, and we kept the money in a white envelope in the brown manila envelope, and that's where I got change." She was not

present at the time of the robbery that took place five hours later in the day. She gave no description of any of the boys she saw other than they were dressed in dungarees and tennis shoes. When asked by Deaver's counsel, "Miss Kieth, was Mr. Deaver one of the boys there, to the best of your recollection?", she replied, "Uh-huh". When asked by the prosecutor, "But you saw these boys coming in and out during that day, or the Deaver boy?" she responded, "Yes, he looks very familiar". She was not asked to identify "Mr. Deaver" or "the Deaver boy" at the trial, nor is there any evidence of any extra-judicial identification by her of any of the boys.

Digioia took the stand to testify in his own behalf. At the time of trial he was twenty years old. His testimony confirmed generally his written statement to the police. He said the reason they parked in the alley was to drink beer, and that he had gone there on other occasions for the same purpose. Prior to June 27, 1974, he had known Deaver for three or four months. He did not know the last names of Chris or Mike and had not seen them before or after June 27th. When Chris said (while they were parked in the alley), "I'm going to get some money, be back in a minute", he "figured he was going home to get some money", but when Chris and Mike returned to the car and said "Let's get lost", he "thought it was a little suspicious". Digioia denied any knowledge of or participation in the robbery of the bakery shop. He said the $27.00 he had at the time of his arrest was money he earned from his employment as "a spreader and a machine operator". He had no prior criminal record. At the time of his arrest on June 27th, he was "rather drunk". On the other hand, the arresting officer testified that he "wouldn't say" Digioia was "pretty drunk" when arrested.

Deaver also testified in his own behalf. He was twenty years old at time of trial. His testimony also essentially conformed to his oral statement to the police. It differed from Digioia's statement in that he denied that "Mike" or "Chris" was in the car when he and Digioia drove to the alley to finish off the beer they had purchased earlier. He agreed with Digioia that Chris was with them and Norman

McDermitt earlier in the day while drinking beer. But he disclaimed any recollection of a "Mike" being with them at any time that day. He thought Chris was a friend of Norman McDermitt. While Deaver and Digioia were drinking beer in the Volkswagen parked in the alley, "two guys did come up to the car". He did not know who they were. He testified: " . . . I'm not sure how they got in the car. I thought they had asked Frank for a ride . . . . But I'm not quite sure how, what Frank said to them, but we did give them a ride". He denied any knowledge of or participation in the robbery of the bakery shop. He also denied being in the bakery shop at any time that day, saying, "I went in that bakery one time about two or three years ago, and that's the only time I can recall ever going in that bakery". At the time of his arrest he had been "laid off" his regular job with a drywell contractor and was working for himself repairing walls for an apartment complex on a part time basis. He further testified that at the time of his arrest he was on probation for his part in an armed robbery of a gasoline station. He had no other criminal record.

### The State's Theory of Guilt

In finding appellants guilty the trial judge stated no findings as to any underlying facts or otherwise gave any reasons for the verdicts. The State argues, however, that the appellants' presence seated in Deaver's automobile within two blocks of the robbery, and their "flight from the scene of the crime", together with the "totality of the circumstances", supports a finding of their guilt beyond a reasonable doubt. Apparently, the theory is that appellants were principals in the second degree, in that although they did not actually rob the bakery shop they were constructively present at the scene of the robbery because they operated what the State contends was the "get-away" car.

The fatal flaw in the theory is total lack of proof that the "two young boys" who robbed the Budget Bakery shop at 5:00 P. M. are the same "two boys" or "two men" whom young Miss Joynes saw enter Deaver's car in the alley. It will be recalled that Miss Joynes testified to no description

whatsoever concerning the two individuals — other than that one of them wore sunglasses and one had a "brownish envelope" in his hand. It will also be recalled that the victim, Mrs. Tenney, said the "two young boys" who robbed her wore dungarees and tennis shoes, one of them wore sunglasses, and "both had hair down to their collars". Digioia said one of the individuals they picked up in the alley had "short brown hair" and the other "shorter length hair", both wore "blue jeans", and one "had sunglasses". Thus, the only common descriptive elements were the dungarees (blue jeans) and sunglasses. The evidence that one of the robbers took a *white* envelope of undetermined size and that one of the individuals seen in the alley (between one and two blocks from the bakery shop) had a *"light brownish"* envelope of undetermined size, if anything, negates identification. With regard to clothing, it is common knowledge that blue jeans (or dungarees) are currently worn by the younger members of our society as the accepted "uniform of the day" on all but the most formal occasions. Such clothing, alone, can hardly be used to distinguish one young person from another, especially in the absence of any evidence of distinguishing features of the particular blue jeans involved, such as holes, patches, floral designs, fading, etc.

As to the sunglasses, here again we do not think they can serve to identify the "young boys" who robbed the bakery shop as the same individuals in the alley. Wearing sunglasses at 5:00 P. M. on June 27th (one of the "longest" days of the year) is certainly not unusual. In the absence of other identification the fact that one of the robbers wore the "same type" sunglasses as those worn by one of the persons in the alley is not helpful to the prosecution's case. State's Exhibit No. 1 for identification (the sunglasses shown both Mrs. Tenney and Miss Joynes at trial) were never actually offered as an exhibit. Technically, therefore, the trial judge should not have considered them. He undoubtedly saw them, however, when they were shown to the witnesses, and they are included in the record before us. There is no evidence of anything unique or unusual about them, or that they were not readily available to any member of the buying public.

On the record before us, we hold that the evidence is legally insufficient to warrant a finding that any of the individuals seen in the alley by Miss Joynes were the actual perpetrators of the armed robbery of the bakery shop. That being so, the appellants could not be guilty, as either principals or accessories, of aiding or abetting them.[1] It is no crime to aid or assist someone unless it is shown by substantial evidence that, with the knowledge of the one rendering the assistance, the person assisted has perpetrated or is perpetrating a criminal act. The fact that appellants told somewhat conflicting stories of the identity or non-identity of the individuals they drove from the alley, or that one of the appellants became "suspicious" of the circumstances, does not, alone, supply that evidence.

It follows from what we have said that the *only* evidence against the appellants is their presence in the general vicinity of the scene of the crime and their hurried departure therefrom. Such evidence, standing alone, is not enough to support the guilty verdicts. *Tasco v. State,* 223 Md. 503 (1960); *Spencer v. State,* 1 Md. App. 264 (1967); *Derricks and Hilgeman v. State,* 9 Md. App. 261 (1970); *Williams v. State,* 3 Md. App. 58 (1961).

Viewing the evidence as a whole, we think the remarks of Judge Gilbert, speaking for this Court in *Craig v. State,* 14 Md. App. 515, at 520, are particularly appropriate to the present case:

> "We think that the finger of suspicion may well point toward the appellant[s], but suspicion is not the basis upon which conviction may be predicated".

We hold that the judgments of conviction were clearly erroneous on the evidence. Md. Rule 1086.

Since we "cannot determine from the record whether or not additional probative evidence can be produced on a

---

1. Appellants were charged as principals and not as accessories. Any proof that they were merely accessories before or after the fact to armed robbery would not have sustained their convictions as principals. Agresti v. State, 2 Md. App. 278 (1967).

retrial", we shall, "as the interests of justice appear to require it", vacate the judgments and remand the case with directions to the trial court to enter judgments of acquittal, unless the State within ten (10) days of the date of our mandate satisfies the trial court that it can produce additional probative evidence of guilt that will warrant a retrial. If the State does preliminarily so satisfy the Court, a new trial may be held according to *Gray v. State*, 254 Md. 385 (1969), as to either or both of the appellants.[2]

> *Judgments vacated and case remanded for further proceedings not inconsistent with this opinion.*

---

**2.** We recognize that such a retrial could pose a serious question of double jeopardy. See Benton v. Md., 395 U. S. 784 (1969); Sapir v. U. S., 348 U. S. 373 (1955). We note that although Benton v. Md., supra, was decided one week before Gray v. State, supra, it was not mentioned therein. Benton held that Federal double jeopardy standards are applicable to state criminal prosecutions.