**Charlene McBRIDE, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 80–703.

District of Columbia Court of Appeals.

Argued Feb. 12, 1981.

Decided Jan. 6, 1982.

Andrew L. Lipps, Public Defender Service, Washington, D. C., with whom Silas J. Wasserstrom, Public Defender Service, Washington, D. C., was on the brief, for appellant.

David Howard Saffern, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry, Michael W. Farrell, and Robert B. Cornell, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KERN, MACK, and FERREN, Associate Judges.

FERREN, Associate Judge:

This case presents two closely related questions of the law of evidence applicable to a prosecution for possession of a prohibited weapon, D.C.Code 1973, § 22–3214(b): whether the trial court erred in refusing to permit appellant to present testimony about certain threats against her, specifically (1) threats—uncommunicated to appellant—by the complaining witness, and (2) threats—both communicated and uncommunicated to appellant—by the complainant's sister and boyfriend. We conclude that the trial court erred in excluding this testimony. Because we cannot determine on this record whether the error was prejudicial or harmless, we remand the case for further proceedings.

### I.

The United States filed an information against appellant, Charlene McBride, charging simple assault on Adrian Gray, see D.C. Code 1973, § 22–504, and possession of a prohibited weapon ("a stick"). See id. § 22–3214(b).[1] A jury trial followed.

#### A. *The Government's Evidence*

The government's theory was that on April 26, 1979, appellant, a private security guard, struck Adrian Gray with a nightstick which she had been carrying beneath her jacket; thus, she was guilty of both simple assault and possession of prohibited weapon. The government presented its case chiefly through the testimony of (1) the complaining witness, Adrian Gray; (2) Adrian's sister, Georgia Gray; and (3) Adrian's boyfriend, Conrad Williams, commonly known as "Warchild."

According to prosecution witnesses, on April 25, 1979, the day before the fight leading to these charges, appellant won a fistfight with Georgia Gray. Georgia reported the fight to her sister, Adrian, and to Conrad Williams. On cross-examination, Georgia Gray and Williams denied that in the wake of that fight they had threatened appellant. On rebuttal, Adrian, too, denied that she had threatened appellant. She testified, to the contrary, that appellant had called her and "said something to the effect that she had beat up my sister and that I was next."

The next day, April 26, Adrian Gray, Georgia Gray, and Conrad Williams visited a friend who lived in the same apartment complex as appellant. As they departed, they encountered appellant and her sister, Tercora Snead, outside. Prosecution witnesses testified that appellant confronted Adrian, who was five-months pregnant, and "said she was going to knock the baby out of her stomach." Appellant then pulled a brown nightstick from beneath her jacket and swung at Adrian Gray's stomach. Adrian jumped back to avoid the blow.

Georgia Gray then jumped on appellant. Conrad Williams and Tercora and Michael Snead tried to break up the fight. During the commotion, appellant broke loose and hit Adrian Gray across the forehead with the nightstick. Georgia testified that Adrian did not strike appellant during the fight. In addition, Adrian, Georgia, and Conrad Williams all denied that any of them had carried knives or any other weapon that day.

#### B. *The Defense Evidence*

Appellant admitted possessing a stick and hitting Adrian Gray with it, but she

---

1. The information also contained a count of simple assault on Georgia Gray. *See* D.C.Code 1973, § 22–504. On the government's motion, the court dismissed this charge before trial.

claimed, with respect to both the assault and possession charges, that she had acted in self-defense. In that regard, in her opening statement, defense counsel alerted the jurors that they would be hearing testimony about threats against appellant by Adrian Gray, Georgia Gray, and Conrad Williams. During trial, defense counsel sought to elicit such testimony from (1) appellant, (2) her sister, Tercora Snead, and (3) appellant's boyfriend, Frank Lloyd. The trial court, however, barred the testimony on relevance and hearsay grounds.

According to defense witnesses, at the time of this incident appellant lived with her sister and brother-in-law, Tercora and Michael Snead. Appellant worked as a private security officer and carried a nightstick while on duty. She left the nightstick in her locker at work on April 24, 1979, and did not pick it up again until after her arrest and release.

Defense witnesses further testified that on April 25, 1979, Georgia Gray had cursed appellant and swung at her, causing a fight between them. Tercora Snead received "about 10" telephone calls from Adrian or Georgia Gray that day. Tercora did not testify as to the substance of the calls, however, for the trial court "sustain[ed] the [government's] objection regarding hearsay telephone conversations."

The trial court also prevented Frank Lloyd, appellant's boyfriend, from testifying about a phone call he had received at appellant's home from the Gray sisters, as well as about his conversation with Georgia Gray concerning her relationship with appellant.

In addition to these calls from the Gray sisters to Tercora Snead and Frank Lloyd, appellant testified that she herself received telephone calls at home on the evening of April 25 from Adrian Gray, who allegedly said, "[Y]ou B, you got my sister, but I am going to kick your ___." Defense counsel asked appellant whether Adrian's boy-

friend, Conrad Williams, had said anything to her over the phone. The trial court, however, sustained the government's objection, stating: "We are not interested in what Warchild said. If he were the complaining witness in this case and said something in the nature of a threat, I would listen to it. But Warchild is not the complaining witness, and neither is Georgia...."

On April 26, the morning after appellant's fight with Georgia Gray, appellant left her apartment to go to the grocery store. Just after she had departed, her sister, Tercora Snead, received a call from Adrian Gray, who said, "MF, I am here." Outside, appellant saw Adrian and Georgia Gray and Conrad Williams. When they began to chase appellant with a knife, she fled back to the apartment and called the police.

When the police did not respond to the call, appellant, this time accompanied by Tercora Snead, began walking to the market again. Adrian Gray, Georgia Gray, and Conrad Williams still were standing outside. Adrian came toward appellant and swung at her; both women started fighting. When Adrian brandished a knife, appellant retreated to the custodian's trashcan, picked up a stick, and hit Adrian Gray on the forehead with it.

Tercora Snead tried to break up the fight and, as a result, began to struggle with Georgia Gray. Conrad Williams grabbed appellant and Tercora Snead. Michael Snead then pulled Williams off his wife. Michael Snead and appellant's nephew, Samuel Robinson, broke up the fight between appellant and Adrian Gray.

### C. The Verdict

The jury acquitted appellant of simple assault, D.C.Code 1973, § 22–504, but convicted her of possession of a prohibited weapon with intent to use it unlawfully against another. Id. § 22–3214(b).[2] The trial court suspended sentence and placed

---

2. Cf. Darden v. United States, D.C.App., 342 A.2d 24, 25 (1975) (defendant convicted of simple assault but acquitted of possession of a prohibited weapon); Matthews v. United States, D.C.App., 267 A.2d 826, 826 (1970) (same), cert. denied, 404 U.S. 884, 92 S.Ct. 221, 30 L.Ed.2d 166 (1971).

appellant on one-year probation under the Federal Youth Corrections Act, 18 U.S.C. § 5010(a) (1976). Appellant timely noted her appeal. *See* D.C.Code 1973, § 11–721(a)(1); D.C.App.R. 4 II(b)(1).

## II.

We begin by examining the crime of possession of a prohibited weapon, D.C.Code 1973, § 22–3214(b) (PPW (b)),[3] and then considering, in general, the relevance and admissibility of threats evidence in relation to a defense against that charge.[4]

A. In 1953, in order to strengthen controls over possession of dangerous weapons in the District of Columbia, Congress amended the statutes governing weapons offenses. *Degree v. United States*, D.C. Mun.App., 144 A.2d 547, 549 (1958); *see United States v. Shannon*, D.C.Mun.App.,

144 A.2d 267, 268 (1958); District of Columbia Law Enforcement Act of 1953, Pub. L.No. 85, 67 Stat. 90. In addition to making changes in the laws proscribing "carrying a concealed weapon"[5] and barring the possession of certain necessarily dangerous weapons[6] (as well as changes in other weapons provisions), Congress added a new section outlawing possession of certain dangerous instruments if—but only if—possession of the weapon is coupled with "intent to use [it] unlawfully against another." District of Columbia Law Enforcement Act of 1953, *supra* § 204(h) (codified at D.C. Code 1973, § 22–3214(b)); *see Jones v. United States*, D.C.App., 401 A.2d 473, 475 (1979); *Darden v. United States*, D.C.App., 342 A.2d 24, 27 (1975); note 3 *supra*.

In contrast with other weapons offenses, therefore, this new section, PPW(b), created a "specific intent" crime.[7] The government

---

**3.** D.C.Code 1973, § 22–3214(b) provides:

No person shall within the District of Columbia possess, with intent to use unlawfully against another, an imitation pistol, or a dagger, dirk, razor, stiletto, or knife with a blade longer than three inches, or other dangerous weapon.

**4.** This case presents no question concerning the prosecution's use of threats evidence to prove a defendant guilty of PPW(b). The trial court permitted testimony, without defense objection, about threats by appellant to the complaining witness, Adrian Gray. Appellant does not contest the admission of this evidence.

We need not specifically consider whether the trial court erred in excluding threats evidence in relation to the assault charge. Because appellant was acquitted of assault, any error as to that charge necessarily would be harmless. *See Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). The double jeopardy clause, moreover, bars a retrial on that charge. *See Burks v. United States*, 437 U.S. 1, 10–11, 98 S.Ct. 2141, 2146–2147, 57 L.Ed.2d 1 (1978); *Kepner v. United States*, 195 U.S. 100, 130, 24 S.Ct. 797, 804, 49 L.Ed. 114 (1904).

**5.** *See* District of Columbia Law Enforcement Act of 1953, Pub.L.No. 85, § 204(c), 67 Stat. 90 (amending Act of July 8, 1932, Pub.L.No. 275, § 4, 47 Stat. 650). This statute, codified at D.C.Code 1973, § 22–3204, provides in pertinent part:

No person shall within the District of Columbia carry either openly or concealed on or about his person, except in his dwelling house or place of business or on other land

possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon capable of being so concealed. . . .

**6.** *See* District of Columbia Law Enforcement Act of 1953, *supra* § 204(h) (amending Act of July 8, 1932, *supra* note 5, § 14). This statute is codified at D.C.Code 1973, § 22–3214(a):

No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot [sic], sand club, sandbag, switch-blade knife, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: *Provided, however,* That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, Air Force, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen, or other duly-appointed law-enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers and retail dealers licensed under section 22–3210.

**7.** "General intent" weapons offenses include possession of a prohibited weapon under D.C.

must prove beyond a reasonable doubt that the defendant had the "intent to use [the weapon] in an assaultive or otherwise unlawful manner." *United States v. Brooks*, D.C.App., 330 A.2d 245, 246–47 (1974). Although PPW(b) does "not require evidence of an attempt to do harm," *Cooke v. United States*, D.C.App., 213 A.2d 508, 510 (1965); *accord, Jones, supra* at 475–76, such an attempt may provide evidence of the defendant's unlawful intent. *See Cooke, supra*, at 510; *Rucker v. United States*, 109 U.S.App. D.C. 362, 363–64, 288 F.2d 146, 147–48 (1961).

■ The specific intent element of PPW(b) provides the basis for a broader defense than the defenses available for general-intent weapons offenses. Three possibilities are instructive. First, if a defendant admits possessing an instrument but denies using (or attempting to use) it against another, she could defend on the ground that during the entire period of possession she had carried the instrument for a wholly innocent,[8] merely defensive,[9] or other lawful (or legally excusable) purpose.[10] Second, if the defendant admits carrying an instrument and ultimately using or attempting to use it against another, she still could defend on the ground that during the period before the fight she had possessed the weapon for a permissible purpose, *see* notes 8–10 *supra*, and that during the fight itself she had harbored no assaultive intent but acted, instead, in self-de-

---

Code 1973, § 22–3214(a), *see Worthy v. United States*, D.C.App., 420 A.2d 1216, 1218 (1980); *United States v. Brooks*, D.C.App., 330 A.2d 245, 247 (1974); note 6 *supra*, and carrying a concealed weapon, D.C.Code 1973, § 22–3204. *See McMillen v. United States*, D.C.App., 407 A.2d 603, 605 (1979); *Shannon, supra* at 268–69; note 5 *supra*.

8. *Cf. Brooks, supra* at 247 ("dangerous weapon" under PPW(b) includes an otherwise useful object that possessor intends to use for dangerous purpose); *Leftwich v. United States*, D.C. App., 251 A.2d 646, 649 (1969) (focus on possessor's purpose in determining whether object is a "dangerous weapon" under D.C.Code 1973, § 22-3204); *Scott v. United States*, D.C.App., 243 A.2d 54, 56 (1968) (same); *Degree, supra* at 549 (same).

Even as to general-intent weapons offenses, we have recognized the possibility of a defense of "innocent or momentary possession" if a defendant could show "not only an absence of criminal purpose" but also "the intent of ensuring that [the] newfound [weapon] is taken as soon and as directly as possible to law enforcement officers." *Hines v. United States*, D.C. App., 326 A.2d 247, 248–49 (1974) (D.C.Code 1973, § 22–3204); *accord, Worthy, supra* at 1218 (D.C.Code 1973, § 22–3214(a)); *Logan v. United States*, D.C.App., 402 A.2d 822, 824–26 (1979) (D.C.Code 1973, § 22–3204); *Carey v. United States*, D.C.App., 377 A.2d 40, 42–44 (1977) (same); *Blango v. United States*, D.C. App., 335 A.2d 230, 235 (1975) (same).

9. A person who possesses a "dangerous weapon" in good faith anticipation of a need to use it in self-defense may be guilty of a general-intent weapons offense, *see* notes 6–7 *supra*, but lack the specific intent to use the weapon in an

unlawful manner necessary to sustain a conviction for PPW(b). *See Logan, supra* at 826; *Wilson v. United States*, 91 U.S.App.D.C. 135, 136, 198 F.2d 299, 300 (1952). It is conceivable, of course, that if a defendant introduced evidence of known threats against her in order to show her honest fear of attack, the jury could infer the contrary: that the defendant had possessed the weapon in order to make a preemptive strike against her enemy. If the jury believed, however, that the defendant had possessed the weapon only for a defensive purpose, the defendant would not be guilty of PPW(b).

By way of comparison, we note that the statute barring carrying a concealed weapon, D.C.Code 1973, § 22–3204, exempts from its coverage carrying a concealed weapon "in [one's] dwelling house or place of business or other land possessed by him . . . ." *Id.; see Billinger v. United States*, D.C.App., 425 A.2d 1304, 1304–06 (1981). In limited circumstances a person can obtain a license to carry a pistol "if it appears that the applicant has good reason to fear injury to his person or property . . . ." D.C.Code 1973, § 22–3206; *see Jordan v. District of Columbia*, D.C.App., 362 A.2d 114, 116–17 (1976); *Jordan v. District of Columbia Board of Appeals & Review*, D.C.App., 315 A.2d 153, 155–56 (1974). Congress, however, has outlawed possession by civilians of machine guns, sawed-off shotguns, and certain other weapons without exception. *See* D.C. Code 1973, § 22–3214(a); note 6 *supra*.

10. *See Jenkins v. United States*, D.C.App., 242 A.2d 214, 216 (1968) (evidence insufficient to find ineffective assistance of counsel because counsel failed to raise a voluntary intoxication defense to PPW(b)).

fense.[11] Third, as in the present case, a defendant could claim she had not been carrying the weapon before the fight but had seized it on the spot for use in self-defense. *See Cooke, supra* at 508–09, 510; note 11 *supra.*

■ B. As to any relevant period of time during which the evidence suggests the defendant was *not using* (or attempting to use) a weapon against another, a PPW(b) charge presents only two questions: (1) Did the defendant possess a dangerous weapon? and (2) Did the defendant intend to use the weapon unlawfully? Evidence tending to prove that the defendant had the weapon for a permissible purpose, therefore, would tend to negate the government's evidence of unlawful intent. It follows that threats *communicated* to a defendant could be relevant by illuminating her state of mind during this period.[12] Threats *uncommunicated* to the defendant, however, would be irrelevant.[13]

■ In contrast, as to a period of a fight when the defendant *used* (or attempted to use) the weapon against another and makes a claim of self-defense, both *communicated* and *uncommunicated* threats become relevant to negate the prosecution's effort to prove unlawful intent. This conclusion follows from the dual aspects of a claim of self-defense: (1) the objective question whether the ultimate victim was the aggressor, and (2) the subjective question whether the defendant was in reasonable fear of imminent great bodily injury. *Johns v. United States*, D.C.App., 434 A.2d 463, 469 (1981); *United States v. Burks, supra* at 286 & n.4–287 & n.5, 470 F.2d at 434 & n.4–435 & n.5. *See generally* W. La Fave & A. Scott, Criminal Law § 53 (1972).

■■ Threats communicated to the defendant may be relevant to both aspects of the self-defense claim, *see Johns, supra* at 469; *Burks, supra* at 286–87, 470 F.2d at 434–35, although the principal focus generally is on their relationship to the defendant's subjective fear. *See Rink v. United States*, D.C.App., 388 A.2d 52, 57 (1978); *Cooper v. United States*, D.C.App., 353 A.2d 696, 702 (1976); *King v. United States*, D.C. Mun.App., 177 A.2d 912, 913 (1962). *See generally* 1 C. Torcia, Wharton's Criminal Evidence § 205 (1972 & Supp. 1981); 2 J. Wigmore, Evidence § 247 (Chadbourn rev. ed. 1979). Moreover, threats communicated directly by the complaining witness typically have the greatest relevance, for those

---

11. Similarly, courts have recognized that self-defense may be an affirmative defense to carrying a pistol without a license, D.C.Code 1973, § 22 3204 (CPWOL). *See Mitchell v. United States*, D.C.App., 302 A.2d 216, 217–18 (1973); *Cooke v. United States*, 107 U.S.App.D.C. 223, 224, 275 F.2d 887, 888 (1960); *Dandridge v. United States*, 105 U.S.App.D.C. 157, 158, 265 F.2d 349, 350 (1959); *Wilson, supra* at 136, 198 F.2d at 300. Unlike PPW(b), however, CPWOL is a general-intent crime. *See* note 5 *supra* and accompanying text. A defendant in a CPWOL prosecution, therefore, cannot claim self-defense to justify possession of the weapon before its use in self-defense. *Hurt v. United States*, D.C.App., 337 A.2d 215, 217 (1975) (per curiam); *see Mitchell, supra* at 218; *Cooke, supra* at 224, 275 F.2d at 888; *Dandridge, supra* at 158, 265 F.2d at 350.

12. Cf. *Cooper v. United States*, D.C.App., 353 A.2d 696, 702 (1976) (when defendant claims self-defense, communicated threats against defendant are relevant to defendant's state of mind); *King v. United States*, D.C.Mun.App., 177 A.2d 912, 913 (1962) (testimony regarding victim's reputation for committing specific violent acts admissible to show defendant's state

of mind); *United States v. Burks*, 152 U.S.App. D.C. 284, 286–87 & n.5, 470 F.2d 432, 434–35 & n.5 (1972) (extrinsic proof that victim committed violent acts admissible to corroborate defendant's claim he feared the victim).

13. Cf. *Burks, supra* at 286–87, 470 F.2d at 434–35 (when defendant claims self-defense, violent aspects of victim's character are relevant to defendant's state of mind only if known to defendant at time of incident); *Griffin v. United States*, 87 U.S.App.D.C. 172, 174, 183 F.2d 990, 992 (1950) (when defendant claims self-defense, uncommunicated threats by victim are probative of victim's conduct).

It is possible, however, that a defendant could offer uncommunicated threats in order to corroborate communicated threats. *See generally* 1 C. Torcia, Wharton's Criminal Evidence § 207, at 429 (1972 & Supp. 1981); 1 J. Wigmore, Evidence § 111, at 553 (3d ed. 1940); Annot., 98 A.L.R.2d 6, §§ 7, 19, 21 (1964 & Later Case Service 1976 & Supp. 1981); Annot., 98 A.L.R.2d 195, § 7 (1964 & Later Case Service 1976).

threats not only pass between the principal parties but also are probative of both the "aggressor" and "fear" issues. *See generally* 1 Wharton's, *supra* § 205. Threats communicated by persons other than the complainant, however, also may shed light on the defendant's state of mind *if* the defendant can lay a foundation showing that she reasonably believed these third persons were acting against her in concert with the complainant. *See* Annot. 98 A.L.R. 6, § 20 (1964 & Later Case Service 1976).

■ Unlike communicated threats, the complainant's threats uncommunicated to the defendant have no direct connection to the defendant's state of mind. They can be relevant only to the question of who struck the first blow. *Griffin v. United States*, 87 U.S.App.D.C. 172, 174, 183 F.2d 990, 992 (1950); *accord, Sellars v. United States*, D.C.App., 401 A.2d 974, 979 (1979); *see Johns, supra* at 469; *Burks, supra* at 286 & n.4, 470 F.2d at 434 & n.4; *Evans v. United States*, 107 U.S.App.D.C. 324, 325–26, 277 F.2d 354, 355–56 (1960).[14] Similarly, uncommunicated threats against the defendant by third persons may be pertinent to the "aggressor" issue if the defendant lays a foundation showing that the third persons were acting against her in concert with the complainant. *See Epperson v. State*, 7 Md. App. 464, 469, 256 A.2d 372, 375 (1969), *cert. denied*, 397 U.S. 1078, 90 S.Ct. 1530, 25 L.Ed.2d 814 (1970). *See generally* 1 Wharton's, *supra* §§ 206–07; Annot., 98 A.L.R.2d 6, *supra* § 20.[15]

■ C. Testimony about threats faces a barrier beyond relevance: the hearsay rule. As we have just seen, a defendant charged with PPW(b) may offer evidence of commu-

nicated threats in order to show her state of mind during different, relevant time periods. If, for example, the evidence suggests that the defendant used, or attempted to use, an instrument against another, she can seek to introduce communicated threats to support a claim that she reasonably feared the other person and acted only in self-defense. Those threats, moreover, would tend to show that even if the defendant had possessed the instrument before the fight, she lacked intent at that time to use it unlawfully.

As to either time period, therefore, the defendant will be offering threats evidence to show its effect on her own state of mind. We have held that threats offered for that purpose are admissible hearsay. *Cooper, supra* at 702.[16] Because, however, such threats are offered not for their truth but for their effect, perhaps they should be characterized, more properly, as nonhearsay. *See* E. Cleary, McCormick on Evidence § 249, at 590–91, § 295, at 700 (2d ed. 1972 & Supp. 1978); 6 J. Wigmore, Evidence § 1789 (Chadbourn rev. ed. 1976 & Supp. 1981); *cf. King, supra* at 913 (reports of prior acts of violence by victim against third persons, known to defendant, are nonhearsay).

■ Furthermore, as indicated above, if a defendant engaged in a fight with the instrument, she may introduce both communicated and uncommunicated threats in an effort to show that she was not the aggressor. *See* Part II.B. *supra*. When a declarant's actions are relevant to a material issue in a case (as are the victim's aggressive actions toward a defendant who asserts self-defense), the declarant's expression of

---

14. In order to introduce evidence of uncommunicated threats by the victim, the defendant must lay a foundation of "substantial evidence, though it be only [her] own testimony, that the [victim] attacked [her]." *Griffin, supra* at 174, 183 F.2d at 992; *accord, Kleinbart v. United States*, D.C.App., 426 A.2d 343, 357 (1981). *See generally* 1 Wharton's, *supra* §§ 205, 207–08; 1 J. Wigmore, Evidence §§ 110–11 (3d ed. 1949 & Supp. 1981); Annot., 98 A.L.R.2d 6, *supra* §§ 10, 13–17; Annot., 98 A.L.R.2d 195, *supra* §§ 10, 13–15.

15. Other circumstances bearing on the relevance of a particular threat may include (1) who made the threat to whom, (2) what was said, and (3) when the threat was made. *See generally* 1 Wharton's, *supra* §§ 201–08; 1 Wigmore, *supra* §§ 105–11; 2 Wigmore, *supra* § 247; Annot., 98 A.L.R.2d 6, *supra* §§ 11–12; Annot., 98 A.L.R.2d 195, *supra* §§ 11–12.

16. *Cf. Rink, supra* at 57 (defendant's statement that deceased had beaten her is admissible under "state of mind exception" to hearsay rule).

intention to perform an aggressive act increases the likelihood that the declarant did so. Such expressions are admissible under the "state of mind" exception to the hearsay rule. *See Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 295–96, 12 S.Ct. 909, 912, 36 L.Ed. 706 (1892); *Clark v. United States*, D.C.App., 412 A.2d 21, 26, 29 (1980); *United States v. Brown*, 160 U.S.App.D.C. 190, 194–95, 490 F.2d 758, 762–63 (1974). *See generally* McCormick, *supra* § 295; 6 Wigmore, *supra* § 1725.

■ D. In summary, if a defendant denies using or attempting to use a weapon and thus makes no self-defense claim in a PPW(b) prosecution, then only communicated threats (which bear on the specific intent element of the crime) are directly relevant to the defense. If a defendant raises a claim of self-defense, however, both communicated and uncommunicated threats become germane: communicated threats bear on the defendant's fear, and both communicated and uncommunicated threats bear on the question whether the complaining witness or the defendant was the aggressor. Accordingly, whether the defendant offers threats evidence for its effect on her own state of mind or for the inference that the victim acted in accordance with expressed hostile intentions toward the defendant, the evidence is relevant and not excludable on hearsay grounds.

In this case the trial court admitted testimony about the complainant's communicated threats against appellant. The government does not question the relevance or admissibility of that evidence. The threats that the trial court excluded are one or more steps removed. Specifically, appellant challenges the exclusion of evidence about (1) threats—uncommunicated to appellant—by the complaining witness, and (2) threats—both communicated and uncommunicated to appellant—by third persons, namely the complainant's sister, Georgia Gray, and boyfriend, Conrad Williams.[17]

Each set of threats presents a particular problem of relevance or admissibility beyond the general rules discussed in this section. In the succeeding parts of the opinion, therefore, we examine each set of threats in turn.

### III.

Appellant first maintains that the trial court erred in excluding evidence of the complainant's threats *uncommunicated* to appellant. She urges that the trial court should have permitted her sister, Tercora Snead, and her boyfriend, Frank Lloyd, to testify about Adrian Gray's threats, made to them, against appellant.[18]

Relying chiefly on *United States v. Akers*, D.C.App., 374 A.2d 874 (1977), the government contends that this court has limited admissibility of uncommunicated threats evidence to homicide cases. To the contrary, we do not read *Akers* to preclude such evidence in every nonhomicide case.

In *Akers, supra*, the defendant, charged with assault on three police officers, claimed self-defense and sought to discover police records that might reveal prior acts of violence by the officers and thus their "proclivity to abusive force." *Id.* at 876. We held that the defendant could not obtain such information when he had not known of the officer's violent character at the time of the alleged offense. *Id.* at 877–78; *accord, In re M.W.G.*, D.C.App., 427 A.2d 440, 443–44 (1981). We acknowledged the established admissibility of prior acts of violence by a victim, whether known or unknown to a defendant, to support a claim of self-defense in a homicide case; but we explained that rule by noting that "in recognition of [the deceased's] absence from the trial, an exception is necessarily made to the general rule against showing conduct by proof of character." *Akers, supra* at 877.

■ In its factual context, therefore, *Akers* held that because of this general

---

**17.** Although defense counsel did not proffer the specific content of each threat, *see* Part VI, *infra*, defense counsel's opening statement and her questioning of both prosecution and defense witnesses indicate that the threats were made against appellant.

**18.** This set of excluded threats made be viewed graphically:

Adrian Gray (CW)  ———→  Charlene McBride (appellant)
Georgia Gray  ———————→  Tercora Snead
Conrad Williams  ——————→  Frank Lloyd

policy against admissibility of evidence to show "proclivity" or propensity to commit a crime, no evidence of the victim's prior bad acts against third persons, unknown to the defendant, is admissible in a nonhomicide case to help answer the objective question of who was the more likely aggressor.[19] We acknowledged in *Akers*, however, that such evidence, if known to the defendant at the time of the altercation, is admissible to help answer the subjective question whether the defendant reasonably believed she was in imminent danger of great bodily injury. *See id.* at 877. *Akers*, therefore, did not address the intermediate question presented here: whether a complainant's uncommunicated threats against a defendant are admissible in a nonhomicide case to show—not the victim's *general propensity* to violence, based on acts against third persons—but the victim's *specific intentions* toward the defendant.[20]

We see no reason to limit the admissibility of uncommunicated threats to homicide cases when the threats bear directly on the victim's intentions regarding the defendant.

Although a complainant's uncommunicated threats against the defendant may reflect the victim's general willingness to use force, they have a more specific probative value. The courts of this jurisdiction long have recognized that when a defendant claims self-defense and introduces some evidence that the victim was the attacker, she also may introduce evidence of threats by the victim, even if uncommunicated to her, in order to illuminate the victim's specific intentions and thus present the concomitant likelihood that the victim struck the first blow. *See Kleinbart v. United States*, D.C. App., 426 A.2d 343, 357 (1981); *Sellars, supra* at 979; *Griffin, supra* at 174, 183 F.2d at 992.[21] Such threats have relevance to a self-defense claim far more targeted than the relevance of general evidence of the victim's character. The *Akers* rule against admissibility of propensity evidence, unknown to the defendant, in a nonhomicide case lacks force in the context of specific though uncommunicated threats by the victim against the defendant.[22]

We decline, then, to extend the *Akers* line between homicide and nonhomicide cases

19. *Akers*, however, did not affect the rule that a defendant in a nonhomicide case can offer evidence of the victim's general reputation for violence (in contrast with specific acts) whether known or unknown to the defendant at the time of the fight. *Johns, supra* at 469 n.8; *see Akers, supra* at 877; *Cooper, supra* at 699 n.8.

20. The government also quotes from our recent decision in *Clark, supra*, to support its theory that we have ruled uncommunicated threats per se inadmissible in nonhomicide cases. In *Clark* we stated:

In homicide cases, statements of the declarant's state of mind have been held admissible in a number of different contexts. First, hearsay evidence of prior threats and assaults directed at the defendant by the deceased declarant have been held admissible, even if uncommunicated to the defendant himself, to show that the defendant was not the aggressor in the altercation which resulted in the death of the decedent or that the defendant reasonably was in fear of the decedent. *United States v. Burks*, 152 U.S.App. D.C. 284, 286–87 & n.4, 470 F.2d 432, 434–35 & n.4 (1972); *Evans v. United States*, 107 U.S.App.D.C. 324, 325–26, 277 F.2d 354, 355–56 (1960); *Griffin v. United States*, 87 U.S. App.D.C. 172, 174, 183 F.2d 990, 992 (1950). [*Clark, supra* at 26.]

This statement, however, merely describes the happenstance development of the law: the cases that established this rule were indeed all homicide cases. These cases, however, did not by their terms limit the admissibility of such evidence to homicide cases as a matter of law. *Johns, supra* at 469 n.8.

21. Although *Akers* cited *Griffin* in support of the statement that evidence of the victim's unknown violent acts is admissible only in homicide cases, *see Akers, supra* at 877–78, that reference, in context, limits uncommunicated threats to homicide cases only when the defense seeks to introduce such threats as evidence of the victim's generally violent character, not when the defense offers them as evidence of the victim's particular hostility toward the defendant.

22. In the same way, Wigmore contrasts the admissibility of *communicated* threats by the victim with the often more limited admissibility of evidence of the victim's reputation known to the defendant:

[Restrictions on admissibility] are less frequently laid down for the present class of evidence, [communicated threats, than for reputation testimony] apparently for two reasons—first, because there is less danger of improperly using the deceased's threats in

beyond the limits of the policy against propensity evidence that originally justified it. We conclude that if the evidence establishes the required foundation, see note 14 *supra,* there is no policy barrier against evidence of uncommunicated threats that illuminate the victim's state of mind toward the defendant, either in homicide or nonhomicide cases. Moreover, such evidence—going to the declarant's state of mind—also clears the hearsay hurdle to admissibility. *See Hillmon, supra* 145 U.S. at 295–96, 12 S.Ct. at 912; Part II.C. *supra.*

In the present case, the trial court excluded evidence of uncommunicated threats against appellant by the complaining witness, Adrian Gray, apparently on hearsay grounds. To the contrary, this evidence, for which there was ample foundation,[23] was relevant to the aggressor issue and was admissible hearsay going to Adrian Gray's state of mind. The trial court erred in excluding it.

### IV.

Appellant next claims that the trial court erred in excluding testimony about *communicated* and *uncommunicated* threats against her by *third persons.* Specifically, she contends that the trial court (1) should have permitted her to testify about threats communicated to her by Georgia Gray and Conrad Williams,[24] and (2) should have allowed Tercora Snead and Frank Lloyd to testify about threats—uncommunicated to appellant—which Georgia Gray made to them.[25] We agree that this testimony would have been relevant and admissible, and that the trial court's ruling accordingly was error.

The government and the defense presented two different versions of the facts and two different legal theories. The jury, however, could have interpreted the evidence in still other ways—and, indeed, apparently did so. The government sought to prove that on April 26, 1979, appellant had struck Adrian Gray with a nightstick, presumably the one appellant used on her job as a security guard. The prosecution argued that appellant therefore was guilty of both simple assault and PPW(b).

Appellant admitted hitting Adrian Gray, but sought to show that she had used only a

---

justification for the killing (less danger, that is, than where he can be shown to be an abandoned ruffian, a curse to the community); and, second, because *specific threats of violence have a more decided bearing on the probability of aggression than mere dangerousness of character.* [2 Wigmore, *supra* § 247(1)(b), at 66 (emphasis added).]

Although other jurisdictions have given the admissibility of uncommunicated threats more attention in homicide than in nonhomicide cases, they have not established substantively different rules for the introduction of uncommunicated threats in the two classes of cases. *Compare* 1 Wharton's, *supra* § 207 *with* § 208 and Annot., 98 A.L.R.2d 6, *supra with* Annot., 98 A.L.R.2d 195, *supra.*

**23.** The defense laid the following foundation of Adrian Gray's overt acts of hostility against appellant: Tercora Snead testified, without government objection, as to one threat by Adrian Gray, uncommunicated to appellant, on the morning of the fight leading to these charges. Appellant and Tercora Snead testified that Adrian and her companions had chased appellant with a knife that morning as she walked to the grocery store. Corroborated by Tercora Snead and neighbor William Heath, appellant additionally stated that Adrian Gray had started the

fight with her. Supported by custodian Floyd Wilson, Tercora Snead, and Michael Snead, appellant also testified that Adrian Gray had pulled a knife on her while she was unarmed. This testimony was more than sufficient to lay the foundation required.

**24.** This set of excluded threats may be viewed graphically:

Adrian Gray (CW)   →  Charlene McBride (appellant)
Georgia Gray    →    Tercora Snead
Conrad Williams →    Frank Lloyd

Appellant never actually testified that Georgia Gray had threatened her. Defense counsel's opening statement, however, anticipated such testimony, and the trial court cut off appellant's discussion of these conversations. The same principles of law govern the admissibility of threats communicated to appellant by Conrad Williams and those, if any, made to appellant by Georgia Gray.

**25.** This final set of excluded threats may be seen graphically:

Adrian Gray (CW)     Charlene McBride (appellant)
Georgia Gray ——→  Tercora Snead
Conrad Williams →  Frank Lloyd

stick that she had grabbed from a trashcan in self-defense. Accordingly, appellant contended, she was not guilty of assault and, because she had been acting in self-defense during the entire period of her possession of the stick, she had lacked the unlawful intent necessary to sustain a conviction for PPW(b).

The jury's verdict, acquitting appellant of assault but convicting her of PPW(b), suggests that the jury fully credited neither the government nor the defense. The acquittal on the assault charge suggests the jury believed that appellant had acted in self-defense during the fight. The conviction of PPW(b), however, suggests the jury discredited appellant's theory that she had grabbed a stick from a trashcan. Rather, the jury may have found that appellant had been carrying her nightstick before the fight and at that time had harbored an intent to assault someone—perhaps Georgia Gray, with whom appellant had fought the day before, or perhaps Adrian Gray, who allegedly had been threatening revenge.

The government's evidence suggested that appellant had been carrying her nightstick *before* the fight with Adrian Gray. Threats communicated to appellant by Georgia Gray and Conrad Williams might have strengthened the evidence that appellant was carrying the nightstick during that period only for a defensive purpose, not with an assaultive intent. *See* Part II.B. *supra.* This evidence, offered to show its effect on appellant's state of mind, is admissible hearsay (or nonhearsay). *See* Part II.C. *supra.*

As to the period *during* the fight, the evidence provided an adequate foundation to make both communicated and uncommunicated threats relevant to appellant's claim that she had struck Adrian Gray in self-defense. *See* Part II.B. *supra.*[26] Georgia Gray's and Conrad Williams' threats communicated to appellant therefore had some bearing on the question whether appellant, confronted by Adrian *and* her associates, was in reasonable fear of immediate bodily injury. Moreover, both their communicated and uncommunicated threats were relevant to the question whether Adrian more than likely started the fight. *See* Part II.B. *supra.* Such threats, accordingly, may have increased the likelihood that appellant acted reasonably by striking out in self-defense. The trial court erred in excluding this testimony as irrelevant or as inadmissible hearsay. *See* Part II.C. *supra.*

## V.

◼ The government contends that defense counsel failed to object to the trial court's exclusion of threats testimony and did not make an offer of proof of its substance; thus, it says, this court must apply the "plain error" standard of review. *See Watts v. United States,* D.C.App., 362 A.2d 706, 709 (1976) (en banc). We disagree. We hold that under the circumstances defense counsel adequately raised this issue at trial and preserved it for appeal. The proper standard of review, therefore, is "harmless error," as articulated in *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).[27]

26. Georgia Gray and Conrad Williams accompanied Adrian Gray to appellant's apartment complex on the morning of the fight. According to appellant, they chased her with a knife when she walked past them toward the grocery store. Georgia Gray and Conrad Williams were present outside when Adrian Gray allegedly attacked appellant, and they quickly joined in the fight. This testimony, if credited, would have supported a conclusion that Adrian, Georgia, and Conrad Williams were acting in concert against appellant and that appellant was aware of their joint, hostile intentions.

27. In *Kotteakos, supra,* the Supreme Court explained the standard for evaluating error of nonconstitutional dimension:

[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand. [ *Id.* ]

A. When a trial court balks at admitting certain evidence, counsel normally should make an offer of proof. A proffer helps the trial court determine admissibility; it may enable the offering party to take action lessening the impact of an adverse ruling; and it enables the appellate court to provide effective review. *See United States v. Walker*, 146 U.S.App.D.C. 95, 99, 449 F.2d 1171, 1175 (1971); *McCormick, supra* § 51. Accordingly, the courts of this jurisdiction long have adhered to the following general proposition:

> A ruling of the court that a question propounded by a party to his own witness should not be answered must be followed by an offer of the testimony expected, or by something which would clearly indicate it, if it is desired to reserve the point for review in this court. [*McCurley v. National Savings & Trust Co.*, 49 App. D.C. 10, 12, 258 F. 154, 156 (1919).]

*See Wilson v. United States*, D.C.App., 261 A.2d 513, 514 & n.4 (1970) (per curiam); *Reed v. District of Columbia*, D.C.App., 226 A.2d 581, 584 (1967); *Pitts v. United States*, D.C.Mun.App., 95 A.2d 588, 590 (1953); *Sisson v. United States*, 54 App.D.C. 189, 190, 295 F. 1010, 1011 (1924); *cf.* Super.Ct.Cr.R. 51.[28]

The courts, however, have not enforced the proffer requirement in a rigid fashion. When the thrust of the expected answer is apparent from the record, relevant to a material issue, and favorable to the party calling the witness, a reviewing court will consider whether or not the trial court erred and, to the best of its ability on the existing record, whether or not the error was prejudicial. *United States v. Chichester Chemical Co.*, 54 App.D.C. 370, 372, 298 F. 829, 831 (1924) (following *Buckstaff v. Russell*, 151 U.S. 626, 636–37, 14 S.Ct. 448, 451–452, 38 L.Ed. 292 (1894));[29] *accord Stafford v. American Security & Trust Co.*, 60 App.D.C. 380, 380, 55 F.2d 542, 542 (1931); *see Origet v. Hedden*, 155 U.S. 228, 235, 15 S.Ct. 92, 94, 39 L.Ed. 130 (1894); *King v. Davis*, 54 App.D.C. 239, 242, 296 F. 986, 989 (1924).

In the present case, defense counsel announced at the outset of trial her intention to produce evidence of threats against appellant by Adrian Gray, Georgia Gray, and Conrad Williams. Defense counsel cross-examined the prosecution witnesses on this issue, but elicited only denials. Defense counsel then attempted to question

---

**28.** Super.Ct.Cr.R. 51 provides:

> Exceptions to rulings or orders of the court are unnecessary and for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and the grounds therefor; but if a party has no opportunity to object to a ruling or order, the absence of an objection does not thereafter prejudice him.

Appellant contends that we must reverse unless the error was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705, *reh. denied*, 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967); *Brooks v. United States*, D.C.App., 367 A.2d 1297, 1309–10 (1976). Because the error in this case involved no violation of appellant's constitutional rights, the *Chapman* harmless error test does not apply here. *See Fox v. United States*, D.C.App., 421 A.2d 9, 12 (1980); *Clark, supra* at 30; *Campbell v. United States*, D.C. App., 391 A.2d 283, 288 (1978).

**29.** In *Chichester Chemical Co., supra*, the court said:

> [W]hen a witness testifies in person at the trial, and is asked a question in proper form, which clearly admits of an answer relevant to the issues and favorable to the party calling him, it is error for the trial court to exclude it, notwithstanding the omission of a tender of the expected answer by the party propounding the question, although of course the court, in its discretion, or on motion, may require the party, in whose behalf the question is put, to state the facts proposed to be proved by the answer. [*Id.* at 372, 298 F. at 831. (citations omitted) ]

Fed.R.Evid. 103(a) now specifically provides:
> (a) *Effect of erroneous ruling.* Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

> (2) *Offer of proof.* In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

three defense witnesses—appellant, Tercora Snead, and Frank Lloyd—about telephone conversations with the Gray sisters and Conrad Williams on the day preceding the fight leading to these charges. On this record, it is apparent that the purpose of defense counsel's line of questioning was to elicit testimony from the defense witnesses that Adrian Gray, Georgia Gray, and Conrad Williams had made threats against appellant. Such testimony presumably would have been favorable to appellant's defense.

In this case, moreover, the trial court's own actions provide a basis for excusing counsel from the proffer requirement. In support of appellant's self-defense claim, defense counsel asked Frank Lloyd, appellant's boyfriend, about his conversations about appellant with Georgia Gray. *See* Part IV. *supra.* When the government objected, however, the trial court refused an offer of proof:

> THE COURT: That is hearsay, [counsel], and I keep telling you that this stuff is inadmissible and you persist.
>
> [DEFENSE COUNSEL]: Your Honor, may I state my grounds?
>
> THE COURT: No, [counsel], you will just ask your next question please.

Subsequently, when counsel asked appellant about threats the complainant's boyfriend had made directly to her, the trial court once again sustained an objection, politely but firmly.

> [DEFENSE COUNSEL]:
>
> Q.: Was anything said to you by Warchild in that telephone call?
>
> A.: Yes, he—
>
> [PROSECUTOR]: Objection, Your Honor.
>
> THE COURT: We are not interested in what Warchild said. If he were the

complaining witness in this case and said something in the nature of a threat, I would listen to it. But Warchild is not the complaining witness, and neither is Georgia, [counsel]. Let's move on please.

"[A]lthough confronting a judge after he has ruled may be risky business," counsel does have a responsibility to make clear her desire to make a proffer. *Walker, supra* at 99, 449 F.2d at 1175. Moreover, we cannot say from this record that the court doubtless would have held defense counsel in contempt for pressing a bit further to make an offer of proof. *Compare In re Schwartz,* D.C.App., 391 A.2d 278, 281–82 (1978) (per curiam) (counsel's persistence in trying to make offer of proof insufficient to sustain contempt citation). On the other hand, the trial court was manifestly unwilling to entertain a proffer of relevant evidence, contrary to its responsibility. *See id.* at 281–82; *Walker, supra* at 99, 449 F.2d at 1175.

We conclude that when, as in this case, counsel has attempted to proffer a particular type of evidence and the trial court has made its unwillingness to entertain a proffer absolutely clear, counsel should not be expected to risk contempt by pressing further to make an offer of proof. Under such circumstances, counsel can be said to have preserved the point for review, subject of course to the possibility of harmless error. *Cf.* Super.Ct.Cr.R. 51 ("if a party has no opportunity to object to a ruling or order, the absence of an objection does not thereafter prejudice him").

■ B. Because the record here does not reveal the content of the alleged threats, we are unable to determine whether the trial court's error was harmless or prejudicial.[30] Accordingly, we remand the

---

**30.** Relying on the fact that there was considerable testimony on both sides of "this simple assault case," our dissenting colleague argues that the excluded threats testimony would have been "cumulative" and that any erroneous evidentiary ruling "was surely harmless." We respond as follows. First, our colleague does not dispute our legal analysis of the relevance and admissibility of the excluded threats testimony in a PPW(b) prosecution. Second, he does not deny that the content of those threats,

which is not now of record, presumably would add precision to the case for the benefit of the defense in a case with sharply different versions of what took place. Third, where PPW(b) is charged, and thus both specific intent and self-defense are the issues, credibility is especially important. We cannot assume that the jury would find additional, more precise defense testimony bearing on those issues to be merely cumulative.

case for an offer of proof of the excluded threats. On remand, the trial court shall rule on the admissibility of the proffered statements. If the court determines that any or all of the testimony should have been admitted at trial, the court shall decide whether its exclusion constituted prejudicial or harmless error. *See Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. at 1248. If the trial court finds the error prejudicial, it shall order a new trial on the PPW(b) charge. If the trial court rules that the error was harmless, the conviction shall stand, subject to a right of appeal to this court. · *Greenwell v. United States,* 115 U.S. App.D.C. 44, 47, 317 F.2d 108, 111 (1963). *See Laumer v. United States,* D.C.App., 409 A.2d 190, 204 (1979) (en banc) (same remand procedure); *Lewis v. United States,* D.C. App., 393 A.2d 109, 118–19 & n.11 (1978), *aff'd on rehearing,* 408 A.2d 303 (1979) (same); *Brooks v. United States,* D.C.App., 367 A.2d 1297, 1311 (1976) (same).

*So ordered.*

KERN, Associate Judge, dissenting:

With all deference, the decision to remand this simple assault case—after the issue of self-defense was fully tried to the jury—for still more proceedings in the trial court constitutes the kind of appellate nitpicking which erodes public confidence in the courts and confirms Mr. Bumble's acrid observation about the law.[1]

Appellant's brief succinctly[2] puts the case in context.

There is no dispute that on the morning of April 26, 1979, Charlene McBride at one point hit Adrian Gray with a stick. The contested issue at trial was whether Ms. McBride acted without provocation, as the Government contended, or in self-defense as appellant claimed.

Under these circumstances, therefore, we could not properly speculate that any error in excluding such testimony would be harmless. That evaluation must be for the trial court based on a defense proffer of testimony not now before this court.

It may be, as our dissenting colleague implies, that this is not a case of great public significance; but it nonetheless presents significant evidentiary issues which, in fairness, this court should not brush aside.

The government witnesses, consisting of complainant, her sister and a friend, testified that appellant McBride struck and bloodied complainant Gray with a stick without provocation or justification.

The five defense witnesses, among whom were the defendant, her sister and a friend, testified that appellant had been threatened verbally and physically before finally picking up a stick from a trash can and striking complainant in self-defense.

Specifically, appellant recounted to the jury that on the day before the alleged stick-swinging incident she had had a fight with complainant's sister and, as a consequence, was threatened over the phone by complainant (Record at 127, 129, 132); that her sister, with whom she was living (Record at 75), also received threatening phone calls from the complainant, the complainant's sister and a friend of complainant (Record at 129, 156); that, thereafter, on the day of the incident, she encountered these same people—armed with a knife—and they chased her home (Record at 130–31); and that, finally, when she went back outside, she had to pluck up a stick to defend herself from their armed attack. (Record at 143.)

Appellant's sister told the jury from the stand that the apartment which she shared with appellant was the target of abusive phone calls from complainant and her sister just prior to the alleged criminal incident. (Record at 79–80.)

Two other defense witnesses testified that the complainant had been armed with a knife and attacked appellant. (Record at 96, 111–12.) Another defense witness confirmed seeing a knife exactly at the scene

---

1. *See* Charles Dickens, *Oliver Twist,* Chapter 51.

2. The brief was prepared by the Public Defender Service, noted for its thoroughness in presenting written argument and its willingness to write in detail and at length to ensure that its points on appeal are clearly understood. Its argument in this case consumes but six pages.

of the confrontation where complainant had been. (Record at 71, 73.)

The jury, with this rich tapestry of testimony before it, acquitted appellant of assault but convicted her of possessing a prohibited weapon, *viz.*, the stick. The majority, however, is dissatisfied with the result of the trial. It concludes that the judge hamstrung the defendant's presentation of her defense of self-defense.

The majority objects to two rulings by the court during this multi-witness trial. The majority opines that such rulings prevented the jury from hearing sufficiently about the threats from the complaining witness and her sister and her friend which were directed, variously, to appellant, her sister and her friend before the stick-swinging encounter. Thus, the majority sees the jury insufficiently apprised of the state of appellant's mind at the time of the crucial incident.

Even the most fastidious review of the record reveals substantial evidence about the threats directed to appellant preceding the alleged criminal incident. Thus, appellant herself testified to the jurors that she received threatening phone calls from the complainant (Record at 127, 129, 132), and further testified that on the morning of the incident her sister, with whom she lived (Record at 75), received calls from complainant and a friend of complainant. (Record at 129, 156.)

Appellant's sister in turn told the jury that on the day before the incident at least ten abusive and threatening phone calls were received at their apartment from complainant and her sister. Appellant's sister testified that, as a result of these phone calls from complainant and her sister, she called the police. She was permitted to testify how the officer who responded answered one such call and had been cursed by complainant or her sister. (Record at 79.)

In addition, this witness—who lived with appellant—was permitted to testify that she had complained to the telephone company about these abusive phone calls from complainant and her sister. (Record at 80.)

Finally, on the very morning of the alleged incident, appellant's sister told the jury of a threatening phone call from complainant. (Record at 85.)

But, says the majority, the trial court erred in refusing to allow a defense witness (neither appellant nor her sister) to testify over objection as to "the substance" of a "conversation" this witness had had with the sister of complainant "about her relationship with Ms. McBride [the appellant]." (Record at 107.) Given the fact that the jury heard voluminous testimony about the hostile relationship that existed between complainant's sister and appellant from their very own lips, it strikes me as patently unnecessary to remand the case now for a proffer from defense counsel as to what exactly *this witness* would have said about *his* conversation with complainant's sister about *her* relationship with appellant.

The other ruling during this trial which so troubles the majority that a remand is ordered for a proffer by defendant is the refusal by the court to permit appellant to testify about a conversation she had over the phone with a friend of complainant. Again, given the evidence in this record of the number of threatening calls appellant received from complainant and her sister, as summarized above, this evidence was at best cumulative and therefore the ruling, if error, was surely harmless.

In sum, the majority writes a dissertation complete with charts concerning the relevance of communicated and uncommunicated threats to the proof of self-defense generally in assault cases when the record in the instant assault case is overflowing with evidence of threats admitted by the trial court at the behest of the defense to show appellant's apprehension of complainant and to justify her use of the stick in self-defense. The majority also plucks two isolated rulings by the trial court from the transcript of a case fully and fairly tried on the issue of self-defense *vel non* (and justification for appellant's possession of the stick) and requires further proceedings for defense proffers of a most speculative nature, so as to prolong the process of determination of guilt or innocence.

I protest this misuse of judicial resources, and I dissent from the majority's opinion.[3]

**3.** The majority (op. at 657, note 30), terms the dissent as an effort to "brush aside" "significant evidentiary issues." Anyone who takes the time to read the record will discover the evidentiary issues relied upon by the majority for its advisory opinion are wholly insignificant. Anyone who takes the time to read the dissent will discover that it does *not* brush aside the evidence but rather describes it in detail and at length so as to demonstrate the remand is wholly inappropriate.